*530 OPINION OF THE COURT
Arthur W. Lonschein, J.
These consolidated matters concern the early history of Gene Barry One Hour Photo Process, Inc. (hereinafter the corporation). This corporation was organized under the laws of New York by three Californians; the petitioner-plaintiff Hal Taines, Gene Barry, and Michael Rafton, who became equal shareholders. Their intent was to exploit a revolutionary one-hour photo-finishing process, then in its infancy.
The strategy adopted by the corporation was to develop and operate a chain of one-hour photo-processing retail stores in the New York metropolitan area. The participants expected to be among the first to utilize the process in this area and so to gain a substantial advantage over any competition. In August of 1981, Hal and Craig Taines, holding a one-third interest in the corporation, were summarily ousted as officers, directors and employees.
The matter before the court is the valuation of Mr. Taines’ shares as of August 27, 1981. After he and his son were removed, Mr. Taines commenced a proceeding for a judicial dissolution of the corporation, under section 1104-a of the Business Corporation Law. The corporation elected to purchase the Taines’ shares, and obtained a stay of dissolution on that basis. (Matter of Barry One Hour Photo Process, 111 Misc 2d 559.) Thus, the issue before the court (is) the fair value of the Taines’ shares as of August 27, 1981.
THE FAIR VALUE PROCEEDING
The proof presented by each side in connection with the valuation aspect of the trial consisted of the testimony of a purported expert in the field and the written report prepared by each expert.
At the outset, I must say that I have grave doubts and misgivings as to the expertise and qualifications of both witnesses. Neither of them testified to any familiarity with the evaluation of a retail business. Neither of them even showed familiarity with the value of leases in midtown or downtown Manhattan. There was no proof that either of them ever participated in a transaction involving a buyer *531 and seller in the sale of any business, let alone the sale of a photo-developing business.
I would have preferred, on the subject of valuation, a business broker whose profession it is to evaluate businesses for the purpose of sale. As an alternative, I would have preferred the testimony of someone with actual experience in the retail photo-developing business. At the very least, I would have expected someone familiar with the industry, who could evaluate the tangible and intangible assets peculiar to this particular business and the innovations it proposed to exploit.
Instead, I am offered the testimony of two strangers to the industry. The petitioner’s expert is a so-called “financial consultant”. His business is to assist corporations in raising capital and in “generating new loan structures * * * with banks.” He evaluates businesses, not for sale or investment, but for tax and estate purposes. The respondent’s expert is a certified public accountant, familiar, of course, with balance sheets and Internal Revenue Service regulations, but unfamiliar with retail businesses in general and the photo-developing business in particular. While he has testified twice before as to his evaluation of businesses, these involved a manufacturing firm sought for acquisition, and certain evaluations relating to the rate base for the Alaska pipeline.
As a matter of law, it is within my discretion to strike the testimony of these witnesses on the grounds that they do not qualify as experts. (Meiselman v Crown Hgts. Hosp., 285 NY 389.) In the exercise of discretion, I choose not to do that, inasmuch as this is a complex matter and neither of the purported experts is wholly unqualified. Their lack of specific expertise is, however, something which I can consider, as trier of the facts, in determining the weight to be given to their testimony. (Felt v Olson, 74 AD2d 722.)
As it turns out, I find both experts’ reasoning fallacious and their conclusions preposterous, and I give no weight whatsoever to either of their ultimate conclusions as to the value of the business. The petitioner’s expert valued the business, as of August 27, 1981, as $20,700,000. The respondent’s expert valued the same business, as of the same day, at $71,000 — a difference of nearly 30,000%!
*532 The petitioner’s expert’s $20 million figure is predicated upon a number of hypotheses which are at best unsupported by the evidence and at worst sheer fantasy. It is based, inter alia, upon the assumption that the company could obtain unlimited credit at will. At the time the projection was made of unlimited credit, this company had only two retail stores operating, and was far from being established in the market. The valuation was also based upon the premise that the corporation had an exclusive market in the process. While the corporation was one of the first to enter the New York market, it wasn’t the first and as of August 27, 1981, a number of stores of other companies were already in operation in New York. Indeed, at the time the first store was opened in New York, a competing store was already in operation in Chinatown using the same process. Not only that, the Japanese manufacturer offered credit for one machine only and refused to give them an exclusive on the machine. All it had given was a vague promise that the corporation would get some kind of a preference for 20 machines over other customers. Even more importantly, this manufacturer was not the only manufacturer of machines using this process: in Japan a number of companies were manufacturing similar machines. The $20 million estimate is also predicated upon the speculation that this process was so new and unique that the public would beat a path to the door of the corporation which could open an unlimited number of outlets. This pie-in-the-sky estimate amounts to speculation that the new process would succeed as quickly as the hula hoop and as thoroughly as the telephone. In point of fact, the prototype for this corporation, a California company, had already gone into bankruptcy.
The testimony of the respondent’s witness was equally absurd. As noted, he valued the corporation at $71,000. He reached this result by ignoring the facts to the same extent as petitioner’s expert, but in the opposite direction. He failed to seriously take into account certain salient factors tending to increase the value of the corporation. As of August 27, 1981, two stores were in operation, one in a desirable and heavily trafficked location in Forest Hills, the other in the most desirable retail district in the world — *533 the Bloomingdale’s-AIexander’s-Lexington Avenue-57th Street midtown shopping area. These leases alone had a substantial value to the corporation. He fails to seriously take into account that a third store was already leased in an almost equally desirable location, 42nd Street and Vanderbilt Avenue near Grand Central, and that negotiations were actively under way for another store in the heart of the financial district, Broadway and Wall Street. He failed seriously to take into account that although this company did not have an exclusive process, it nevertheless was one of the first companies to exploit the process in the New York area. The value of this head start, while not as great as was assumed by the petitioner’s expert, is surely not negligible. He failed to seriously consider that the company had the nationally recognized name of Gene Barry which would attract the public and thus be a significant, if intangible, asset to the business. He overemphasized certain start-up and depreciation expenses incurred by this brand new business and failed to give enough emphasis to the cash flow profit already generated by both opened stores.
I would have to accept, if I were to believe this testimony, that a business, with a revolutionary concept, in on the ground floor in the world’s greatest retail market, with a famous, recognizable name at its masthead, with initial funds of $690,000 at its disposal, having rented three stores in the best and most heavily trafficked retail areas in the city, with excellent prospects of concluding other such leases, in business but three months and initially showing a real profit in that time, is worth no more than a New York City taxi medallion or a newsstand in a midtown office building — that is, $71,000.
Having disregarded the conclusions offered by the two experts for the reasons set forth above, it becomes incumbent upon me to find and formulate a means by which I can evaluate the business as the trier of the facts. There are instances where such a trier can complete its task without the aid of experts. Indeed, the Court of Appeals observed 100 years ago there are times when the “impartial, unbiased judgment of twelve jurors of common sense and common experience” would generally produce a more just *534 outcome “than * * * by taking the opinions of experts * * * whose opinions cannot fail generally to be warped by a desire to promote the cause in which they are enlisted.” (Ferguson v Hubbell, 97 NY 507, 514.)
The statute (Business Corporation Law, § 1118, subd [b]) directs the court to make its determination of fair value as of the day before the institution of the proceeding, but, significantly, does not specify the method which the court should use to make the determination. There is also a dearth of case authority specifically directed to valuation under this section. While it has been suggested that the “fair value” provisions of section 623 of the Business Corporation Law (involving proceedings brought by dissenting stockholders in merger situations) should be imported into a proceeding under section 1118, the Appellate Division in the Second Department has specifically held otherwise (Matter of Fleischer, 79 AD2d 636) and the court is not bound to apply that section here.
It would appear, therefore, that the court is free to develop its own method of valuation, so long as the method adopted is based upon recognized criteria and the facts of the case. There are certain accepted principles found in case law which may be taken into consideration in any stock valuation proceeding. They are evaluation under the net asset value method, market value method and investment value method. (Matter of Fulton, 257 NY 487, 494; Matter of Endicott Johnson Corp. u Bade, 37 NY2d 585, . 587.)
Accordingly, I shall examine each method and determine if the same can be applied to the matter at bar.
The net asset value method cannot be the basis for an evaluation of Taines’ shares of stock under the circumstances of this case. This fair value proceeding arose out of the corporation’s election to purchase the Taines’ stock interest rather than submit to dissolution as Taines had demanded. Had dissolution been ordered, net asset value would then have been the only way to ascertain Mr. Taines’ share of the business. However, it has been held “that net asset value is not the basis * * * in determining the value of the stock * * * as a going concern” (Matter of Marcus, 273 App Div 725, 728-729). Since the corporation *535 has opted by its election to continue as a going business, the valuation should be the value of the business as a continuing entity rather than its value in liquidation. (Matter of Behrens, 61 NYS2d 179, 182, affd 271 App Div 1007.) The net asset method relies heavily on accounting methods which do not provide an accurate measure of a going business. It does not value certain intangibles which, by their nature, may have infinitely more value than the tangibles, such as good will, location or in the instance of this corporation, the exploitation of a new process.
Another method of valuation is the so-called market value method. Market value of stock has been defined as “the attraction a stock has in the market place and the extent to which the movement of this stock reflects the unfettered judgment of the buyers and sellers.” (Matter of Lipe-Rollway Corp. v Seligson, 59 Misc 2d 805, 806.) Measured by these criteria, Mr. Taines’ stock has no value at all. It must be remembered that the corporation is a close corporation with three equal stockholders. That being so, the relationship between the stockholders vis-a-vis each other in practice closely approximates the relationship between partners. (Matter of Gordon & Weiss, 32 AD2d 279, 281.) In this close corporation, it was never intended that any of the stock be traded on the open market. More importantly, however, no one would buy the stock from Taines at any price to find himself in the position of Taines — frozen out, without salary, without office, without a say in the corporation’s affairs and completely dependent upon the remaining two stockholders to declare dividends if, as and when they choose to do so.
The only feasible method by which to evaluate petitioner’s one-third share is by the investment value method: that is, to find what a prudent informed investor would be willing to pay in order to buy the entire business as a going business, considering its assets, liabilities, tangibles and intangibles; and, after arriving at such a figure, to reduce it two thirds, which would leave the petitioner’s share. (Matter of Behrens, supra; Matter of Lipe-Rollway Corp. v Seligson, supra.)
It was exactly this type of solution which I had in mind in my examination of the two experts. I asked them to *536 assume certain hypotheses which were found in the record, and then asked them what a bona fide knowledgeable buyer would pay for the business in an arm’s length transaction. In making my evaluation, this is the criterion I intend to employ.
One of the difficulties in making an evaluation in this case is the relative youth of the company as of the time the valuation must be made. The company had been open for business for no more than four months prior to August 27, 1981. The first store had opened in Forest Hills in April, 1981. The 57th Street and Lexington Avenue stores had opened in May, 1981. The 42nd Street store had not yet opened and was being rehabilitated for the business. The company was negotiating for a lease at Broadway and Wall Street, with excellent prospects for opening a store there. Other stores were planned, again with excellent prospects for successful openings. Thus, the company was in its phase of initial, and presumably greatest, growth.
The first question asked by a prudent investor, seeking to buy the business, would be: what is the cash flow? It appears that the business, although not as successful as the organizers’ original projections, was showing a substantial positive cash flow as of the valuation date. It had net assets of $538,000 in excess of liabilities other than its shareholders’ loans, which was certainly enough to open the 42nd Street and Broadway stores. The Forest Hills store was producing a positive cash flow of $6,000 per month and the 57th Street store was producing a positive cash flow of $20,000 per month. In view of the choice areas that the 42nd Street and Broadway stores were to open, it could reasonably be expected that their cash flows would be comparable to the 57th Street store. That being so, the corporate cash flow, based upon all four stores being open, would total $66,000 per month or $792,000 per year. The testimony of the witnesses, based upon certain reports and documents in evidence, suggests that the photo-processing business is seasonal, and that the stores had opened during the peak season. Assuming an annual adjustment downward of 15% for seasonality, the annual cash flow would still be $678,000. I find that a practical experienced business buyer, who was ready, willing and able to purchase *537 this business on August 27, 1981 would have been willing to pay the price of double the adjusted annual cash flow, or $1,356,000.
I base this finding not only on the annual cash flow, but also upon other factors. First, the business, although relatively new, made a profit in the first months of operation despite the testimony that most new businesses fail in the first year of operation. Second, the business had a great attraction to the public in that it embodied a revolutionary process in photo finishing — one hour from dropping off the exposed roll to picking up a finished high quality print. Third, it was in on the ground floor of this new process. Fourth, from the evidence, it appears that the cost to the consumer was fully competitive with that of the established photo finishers in the market. Fifth, the name of Gene Barry, which belonged to the corporation, had a high recognition factor and was of significant value as a drawer of business. It was not impossible for the name to prove to be as great an asset to a photo-finishing business es that of Colonel Sanders to fried chicken, or Arthur Murray to dance studios. Sixth, the corporation was able to locate its outlets in the best retail markets in the city. Leases in Manhattan in recent decades have always gone up in value — never down. The fact that these leases were available at 1981 prices in these locations would be a great incentive to a prospective buyer — since what would be bought was a stable, long-term business.
Of course, any business involves risk, and in making my valuation I have taken into consideration not only the positive factors set forth above, but also such negative factors as the expenses of starting up and running new stores, depreciation of equipment, the likelihood of future competition from other businesses offering the same service, and the inherent risk associated with any new enterprise. I feel that I have made a conservative valuation, and have arrived at a price which the evidence and my common sense tells me that a prudent buyer would pay considering all significant positive and negative factors.
Having found that the value of the corporation was $1,356,000 as of August 27,1981,1 must allocate $645,000 of that sum to repayment of the outstanding shareholders’ *538 loans. The balance then is $711,000. The value of Taines’ shares is therefore one third of $711,000, or $237,000. The petitioner is entitled to judgment in the amount of $237,000, with interest from August 27, 1981.
TERMS AND CONDITIONS
It remains for me to fix the terms and conditions of the corporation’s purchase of the shares, pursuant to the statute. (Business Corporation Law, § 1118, subd [a].) I decide that execution may issue forthwith and that no terms and conditions permitting a deferred payment should be imposed by the court, given the history of this corporation and the circumstances of the case.
The legislative purpose of subdivision (a) of section 1118 was to provide an alternative to a dissolution while at the same time protecting the interests of minority stockholders from the actions of the majority. (See NY Legis Ann, 1979, p 143, mem of Finneran.) There is no case law or other statutory guidance that would define the meaning of the statutory language “upon such terms and conditions as may be approved by the court” or guide the court in the formulation and imposition of proper “terms and conditions”. It seems to me that since the Legislature has provided an alternative to dissolution, it has given the court discretion in a proper case and upon good cause shown to fix terms of payment in order to permit the corporation to continue as a viable business without undue disruption.
I decline to exercise that discretion in the matter at bar, however, given the nature of the oppressive conduct of the Barry-Rafton group. In my judgment, this conduct makes it unfair and unjust to permit the corporation the advantage of a deferred payment, to the further disadvantage of the petitioner. As noted above, this close corporation was in effect a partnership consisting of Taines, Barry and Rafton, clothed with the benefits peculiar to a corporation, such as limited liability, perpetuity and the like. (Matter of Pivot Punch & Die Corp., 15 Misc 2d 713, 715.) That being so, what really happened here is that two partners, owing the third partner “the highest degree of fidelity, loyalty, trust, faith and confidence” (Matter of Pivot Punch & Die Corp., supra, p 716), forced out that third partner and then *539 proceeded to reap the benefits that the business had to offer. In so doing, they totally destroyed his reasonable expectation of a continuing one-third interest in a growing and profitable venture.
Barry and Rafton have controlled the corporation for a period of more than two years, to the exclusion of the petitioner. During this time they have enjoyed all of the advantages that went with control: they have been able to give salaries to their sons, in whatever amounts the business could support, without the petitioner's son being given a nickel; they, and not the petitioner, have been able to collect director’s fees; they, and not the petitioner, have had the perquisites and personal advantages available to the management; and they, and not the petitioner, have had the unfettered discretion to run and expand the business as they saw fit. Last, and far from least, during this period they, and not the petitioner, have had the use of the petitioner’s substantial equity and loan investment in the corporation. While it does not affect the value of the petitioner’s shares as of August 27,1981, it is relevant here to note that the value of the business has increased greatly since that time, due in no small part to the petitioner’s investment, and that this increase has accrued solely to the benefit of Barry and Rafton, and not the petitioner.
The petitioner has already been the victim of oppressive conduct (Matter of Barry One Hour Photo Process, 111 Misc 2d 559, supra). In view of the points just discussed, to allow lenient terms of payment to the corporation would be to lay another stripe on him.