Argued and submitted September 19, judgment modified on appeal, affirmed as modified on appeal and cross-appeal November 30, 1988, Wyss' reconsideration denied January 13, Columbia Management Co.'s reconsideration denied February 17, both petitions for review denied March 21, 1989 (307 Or 571)

## COLUMBIA MANAGEMENT CO.,
*Respondent - Cross-Appellant,*

*v.*

## WYSS,
*Appellant - Cross-Respondent.*

(A8502-01236; CA A44975)

765 P2d 207

James H. Clarke, Portland, argued the cause for appellant -

cross-respondent. With him on the briefs was Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

Barnes H. Ellis, Portland, argued the cause for respondent - cross-appellant. With him on the brief were Charles F. Hinkle, Christine Kitchel and Stoel, Rives, Boley, Jones & Grey, Portland.

Before Warden, Presiding Judge, and Warren and Rossman, Judges.

WARDEN, P. J.

## WARDEN, P. J.

This is an action under *former* ORS 57.865 to ORS 57.890[1] to determine the value of the shares of petitioner's stock that Loren Wyss (Wyss), a dissenting shareholder, holds in Columbia Management Company (Columbia). The trial court accepted the value proposed by a panel of appraisers. In arriving at that value, the appraisers first determined Columbia's enterprise value and the proportion of that enterprise value that Wyss' shares represented. They then applied successive minority interest and marketability discounts in order to determine the fair market value of Wyss' shares. The result of the discounts was that the final value for Wyss' shares was about 44 percent of their proportionate part of Columbia's enterprise value. On appeal, Wyss challenges both discounts. The facts are not in dispute; the only issue is one of law. We hold that the trial court correctly applied a marketability discount but that it should not have also applied a minority interest discount. We therefore modify the judgment.[2]

Columbia is a successful financial services corporation. Wyss was one of its founders and was an employe until the end of 1981.[3] During his employment, he acquired 18,000 shares of Columbia's stock; after his termination, he was the only non-employe shareholder. His holdings represented a little over 14 percent of the total shares. By late fall 1984, they were the only shares not covered by a buy-sell agreement among the shareholders.

On November 1, 1984, Columbia notified its shareholders of a special meeting, to be held November 14, to consider authorizing 900,000 additional shares, 100,000 of which were to have such rights and preferences as Columbia's board might designate at the time of issuance. The notice informed the shareholders of their statutory dissenter's rights and that, if they intended to exercise those rights, they had to do so

---

[1] *Former* ORS 57.865 to ORS 57.890 were repealed by Or Laws 1987, ch 52, § 181, and were replaced by ORS 60.551 to ORS 60.594. We will refer to the statutes as they were before the change.

[2] We also affirm on Columbia's cross-appeal.

[3] *See Wyss v. Inskeep,* 73 Or App 661, 699 P2d 1161, *rev den* 300 Or 64 (1985), for the circumstances of Wyss' termination as an employe.

before the meeting. ORS 57.875. Wyss complied with the various statutory requirements for dissenting and for receiving the fair value of his shares. Columbia valued his holdings at $60 per share, which was slightly above their book value, and tendered that amount, a total of slightly over $1 million. Wyss replied, demanding $10.5 million. *See* ORS 57.880(3)(4).

The parties were unable to resolve their disagreement, and Columbia then filed this action, asking the court to determine the fair value of the shares. ORS 57.885(1). The court appointed appraisers to recommend a decision on the question of fair value. ORS 57.865(2); ORS 57.885(4). The appraisers first decided that "fair value" meant "fair market value." After taking evidence from both sides, they concluded that the best method of finding fair market value was to determine the value of Wyss' proportionate share of the total business and then to adjust that value to reflect Wyss' minority position and the lack of a ready market for shares that were not actively traded. They first determined that Columbia's enterprise value was $50 million and that Wyss' proportionate share of that value was $7.185 million. They then applied successive discounts of 33.3 percent each, the first for Wyss' minority position and the second for the difficulty of marketing his shares. They reported that the fair value of Wyss' shares, after the discounts, was $3.196 million. The issue on appeal is the appropriateness of the discounts.

A shareholder who has the right to dissent from a corporate action and obtain payment for the shareholder's shares under ORS 57.870[4] is entitled to receive the "fair value" of the shares. ORS 57.875(2); ORS 57.885(1). ORS 57.865(2) provides:

> " 'Fair value' of shares means their value immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless the exclusion would be inequitable."

---

[4] Wyss' right to dissent comes from ORS 57.870(1)(d), which provides, in pertinent part, that shareholders have a right to dissent from any

"amendment of the articles of incorporation materially and adversely affecting the rights pertaining to the shares of the dissenting shareholder by:

"(A) Altering or abolishing a preferential right of the shares * * *."

That definition "is hardly self-executing in its clarity * * *." *O'Connor Appeal,* 452 Pa 287, 291, 304 A2d 694 (1973). It simply defines "fair value" as "value" at a certain time and excludes factors that neither party to this case seeks to include. The official comments to § 13.01 (formerly § 81(a)) of the Model Business Corporation Act, the source of this provision, state that the definition

> "leaves to the parties (and ultimately to the courts) the details by which 'fair value' is to be determined within the broad outlines of the definition. This definition thus leaves untouched the accumulated case law about market value, value based on prior sales, capitalized earnings value, and asset value."

■    The accumulated case law to which the commentary refers is somewhat more helpful than is the bare statutory definition. A number of dissenters' rights statutes use "fair value" as the standard for determining what the corporation must pay for the dissenter's shares. Cases under those statutes generally hold that "fair market value," in the sense of what a willing buyer would pay a willing seller, is only one of the criteria to consider. They generally emphasize three approaches to determining fair value: Market value, net asset value, and earnings or investment value.[5] *See, e.g., Ford v. Courier-Journal Job Printing Co.,* 639 SW2d 553, 555 (Ky App 1982); *O'Connor Appeal, supra; but see Perlman v. Permonite Mfg. Co.,* 568 F Supp 222 (ND Ind 1983), *aff'd* 734 F2d 1283 (7th Cir 1984).[6] Determining a fair price requires considering all three approaches; the relative weight given each will depend on the circumstances of the case. *See Atlantic States Construction v. Beavers,* 169 Ga App 584, 586, 314 SE2d 245 (1984); *Richardson v. Palmer Broadcasting Co.,* 353 NW2d 374, 376-377 (Iowa 1984); *Woodward v. Quigley,* 257 Iowa 1077, 1082, 133 NW2d 38, 136 NW2d 280 (1965); *Moore v. New Ammest, Inc.,* 6 Kan App 2d 461, 630 P2d 167 (1981);

---

[5] For the purposes of this opinion, earnings value or investment value are simply different names for what the appraisers called "enterprise value."

[6] There are no Oregon cases which directly consider this issue. However, in *Delaney v. Georgia-Pacific,* 42 Or App 439, 449-454, 601 P2d 475 (1979), *rev den* 288 Or 519 (1980), we considered the Supreme Court's use of "fair price" and "appropriate value" in a stock appraisal case. We concluded that there were a number of different ways to determine that value, of which market price was only one, although it happened to be the best one in that case.

*Sarrouf v. New England Patriots Football Club, Inc.,* 397 Mass 542, 548-549, 492 NE2d 1122 (1986); *Dreiseszun v. FLM Industries, Inc.,* 577 SW2d 902, 906 (Mo App 1979); *see also* 12B Fletcher, *Cyclopedia Corporations,* § 5906.12 (rev ed 1984); *Annot.,* 48 ALR3d 430, 435-437 (1973).

Several cases on corporate valuation provide examples of how courts apply the various approaches. In *Sarrouf v. New England Patriots Football Club, Inc., supra,* one corporation was merged into another. The original corporation had 100,000 shares of voting stock, all owned by one person, and 139,800 shares of non-voting stock, owned in part by members of the plaintiff class. Other than voting, the rights of the shares were identical. The court noted that market value cannot be a reliable indicator of actual value when there is no established market and that reconstructing a hypothetical market value may be no more than evaluating the other factors. Instead of trying to do so, the court determined the value of the plaintiffs' shares by dividing the number of shares into the value of the enterprise as a whole. It pointed out that, when a partial ownership is taken against the owner's will, and the alternative of pro rata valuation of the entire business is readily available, the owner should not have to abandon the stake simply because the market cannot accurately reflect its value.

In *Ford v. Courier-Journal Job Printing Co., supra,* the company was closely held and there was no active market; the few transactions were special cases and did not establish a market price. The earnings approach produced a value of $85 per share, while the net asset approach resulted in a value of $165 per share. The appraisers and the trial court accepted the net asset approach, but applied a 25 percent marketability discount, resulting in a fair value of $124. The appellate court affirmed, noting that the use of a marketability discount simply indicated that the trial court had given some weight to market value in determining fair value. The court emphasized that the discount was not based on the dissenters' minority position.

In *Dreiseszun v. FLM Industries, Inc., supra,* the court also rejected market value as the sole measure and insisted on a more comprehensive definition of fair value. The corporation had sold essentially all of its assets. It proposed to

use part of the proceeds to buy out the minority at $23 per share and then to operate the business as an investment holding company for the benefit of the majority. The trial court held that $23 was the market price, because other minority shareholders had accepted it, and it therefore set the fair value of the dissenters' shares at $23. The appellate court disagreed. It pointed out that the dissenter appraisal statutes were designed to replace the requirement of unanimous shareholder consent to a transfer of substantially all of the corporate assets, that the right of appraisal is a substitute for the protection that the requirement of unanimity had previously provided the minority, that the minority should not be penalized by a discount for taking advantage of that protection and that the price of the sale of the assets, to which no one objected, established the fair value of the entire corporation. The court held that the fair value of the dissenters' shares was a proportionate share of that price. 577 SW2d at 907-908.

In *Atlantic States Construction v. Beavers, supra,* the court agreed that the apparent intent behind the term "fair value" is to allow considerable flexibility in valuation and to avoid strict adherence to the "willing seller, willing buyer criterion." 169 Ga App at 586-587. The court then held that the focus of the valuation should be on the shares held by the dissenters, rather than on some specified percentage of total corporate worth. For this reason, it concluded, the trial court erred in failing to apply marketability and minority discounts. It emphasized, however, that courts should apply such discounts with caution, as other aspects of the appraisal might already have taken them into account.

Finally, in *Woodward v. Quigley, supra,* the court discussed how to balance all of the factors in determining the value of the dissenter's shares. The most important factor in most cases, it pointed out, is investment or enterprise value, because that value reflects the business' worth as a going concern. The purpose of the appraisal statute is to ascertain what the dissenter actually loses because of his or her unwillingness to go along with the controlling shareholders' desires. The court refused to accept a minority discount because it would be a departure from that purpose. Such a discount affects market value more than investment value. The statute allows the majority to override the minority so long as it adequately protects the minority's interests. There

would be no protection if the minority could be squeezed out for less than the real value of its interest. 257 Iowa at 1083-1086.

These cases are not entirely consistent, partly because the facts of each case are unique and partly because courts have evaluated the factors in different ways. It is clear, however, that, except in a few jurisdictions, such as Indiana, *see Perlman v. Permonite Mfg. Co., supra,* "fair value" does *not* mean "fair market value." Market value is, at most, one factor in determining fair value. Courts have adjusted market value to reflect other factors, even when the corporation in question is traded on a national securities exchange. *See, e.g., In Re Valuation of Common Stock of Libby, Etc.,* 406 A2d 54 (Me 1979).

What is fair value necessarily depends on the circumstances of the particular case. Apparent conflicts between one case and another may disappear when we place their specific facts in context. Thus, the court in *Dreiseszun v. FLM Industries, Inc., supra,* required the corporation to pay for the dissenters' shares their proportion of the value of whole corporation without any discount, but in *Ford v. Courier-Journal Job Printing Co., supra,* the court upheld a marketability discount. In *Dreiseszun,* the corporation had sold its assets and become an investment holding company; because its fair value was essentially the book value of its investment assets, there was no reason for a discount. In *Ford,* on the other hand, the company continued to use its physical assets in its regular business, and its asset value was almost twice its enterprise value. A discount to reflect marketability problems was appropriate in those circumstances.

■ In short, there are no hard and fast rules for determining the fair value of dissenters' shares. The determination must take into account the various approaches to evaluating corporate assets, earnings and business prospects without regard to the events that triggered the dissent. It must reflect that a necessary result of dissenting is the dissenters' loss of their opportunity to share in the corporation's prospects. It should also recognize the legislative purpose of protecting dissenters from the effects of changes that they can neither influence nor control. We turn to the issues in this case with these considerations in mind.

■ The appraisers set Columbia's enterprise value at $50 million; the trial judge accepted that value, and we see no reason for disagreeing. We also agree that enterprise value is the best way to value this corporation as a whole. However, Columbia's enterprise value primarily reflects its success in developing a strong mix of employes and clients. Those clients can readily leave if investment results decline, and there are no noncompetition agreements or similar disincentives to keep dissatisfied employes from also leaving. The value of the company, therefore, is significantly less stable than if it were in some other business where its product was more tangible and less subject to change, its employes more readily replaceable[7] and its market less volatile. The potential volatility in the company's value is a risk that anyone holding Wyss' shares would have to accept. That risk would make the shares unmarketable if the price were simply their proportionate share of the enterprise value.

■ The appraisers stated that a marketability discount reflects the illiquidity of the shares of a closely held corporation. Market value is certainly one approach to fair value, and a marketability discount would take that approach into consideration. *See Ford v. Courier-Journal Job Printing Co., supra,* 639 SW2d at 556. The 33.3 percent discount that the appraisers proposed is greater than that in any of the cases we have discussed, although the appraisers state that it is not inconsistent with discounts that the market actually applies to such corporations. It appears to be adequate to reflect the potential volatility in Columbia's enterprise value and the fact that its asset value is considerably less than the enterprise value, as well as the marketability problems that affect the shares of all closely held corporations. We agree with the trial

---

[7] Columbia's president, in explaining in 1976 the need for an executive bonus plan, commented:

" '[T]he investment management business is absolutely dependent upon the ability of its people to make sound judgments. That ability is partly talent but it is also a skill developed through long experience * * *. Yet, the value of Columbia Management Co. is more than the sum of its people. These people work smoothly together and offer a better service together than alone, and most successful organizations reach a level of effectiveness as a group which individuals may never reach alone. * * * Because of the critical nature of this association, losing a member of the group is more serious than in most occupations, and, since other advisors operate in the same way, it is difficult and expensive to attract competent replacements from competitors who carefully guard their own personnel.' " *Wyss v. Inskeep, supra,* 73 Or App at 664.

court that it was appropriate to reduce the value of Wyss' shares by that discount.

■        The minority discount is another matter. That discount recognizes that controlling shares are worth more in the market than are noncontrolling shares. *See Baker v. Commercial Body Builders,* 264 Or 614, 507 P2d 387 (1973); *Tryon et al. v. Smith,* 191 Or 172, 229 P2d 251 (1951). However, because a dissenting shareholder is exercising a right designed for his or her protection, and because the purchaser of the shares will be the corporation, not an outsider, this recognition of decreased market value may not be appropriate. "It is contrary to the purpose of the statute to discount the minority interest because it is a minority. This in effect would let the majority force the minority out without paying it its fair share of the value of the corporation." *Woodward v. Quigley, supra,* 257 Iowa at 1087. A leading authority on business valuation states that discounts of any sort are questionable in a dissenter's rights case:

> "[T]here is less reason to discount the intrinsic value of stock in a dissenting shareholder valuation than in other types of transactions because it represents a minority interest, lacks marketability, or is subject to transfer restrictions. *The purpose of applying these discount variables is to determine the investment value or fair market value of a minority interest in the context of a hypothetical sale between a willing seller and buyer, a situation that does not exist in the dissenting shareholder situation.*" Haynsworth, *Valuation of Business Interests,* 33 Mercer L Rev 457, 459 (1982). (Emphasis supplied.)

*See also* Comment, *Valuation of Dissenters' Stock Under Appraisal Statutes,* 79 Harv L Rev 1453, 1454-55, 1464 (1966). Even courts that approve the application of a minority discount emphasize the need to do so with caution. *See Atlantic States Construction v. Beavers, supra.*

A number of cases distinguish between marketability and minority discounts, approving the former and rejecting the latter.[8] In *Brown v. Allied Corrugated Box Co.,* 91 Cal App

---

[8] In the cases that we discuss in this portion of the opinion, minority shareholders brought actions to have the corporation involuntarily dissolved on the ground of misconduct by the majority. Both California and New York permit the corporation to defeat such an action by purchasing the minority's shares for their fair value. We do not believe that this slightly different context for the determination of fair value affects the relevance of these cases to the issues before us, because the statutory standard is the same.

3d 477, 154 Cal Rptr 170 (1979), the court rejected a minority discount, although it recognized that the shares would be subject to a considerable decrease in value if the plaintiff sold them on the open market. That fact, however, had little validity when the corporation or someone already in control of it is the purchaser; one could not then say that the shares are worth less because they were noncontrolling. 91 Cal App 3d at 486.

In *Taines v. Gene Barry One Hour Photo Process,* 123 Misc 2d 529, 474 NYS2d 362 (Sup 1983), *aff'd* 108 App Div 2d 630, 486 NYS2d 699, *app dism* 66 NY2d 757, 488 NE2d 113, 497 NYS2d 367 (1985), the court noted that market value was an inappropriate measure, because there was none; no one would buy stock in order to be frozen out of the business. The only appropriate way to determine the value of the shares was to calculate their proportion of what a prudent buyer would pay for the entire business as a going concern. 474 NYS2d at 367.

The most careful consideration of the issue is *Mtr Blake v. Blake Agency,* 107 App Div 2d 139, 486 NYS2d 341, *app den* 65 NY2d 609, 494 NYS2d 1028 (1985). The court emphasized that the trial court should value the corporation as a whole by what a willing purchaser would pay for it as a going business, because market value of the individual shares is usually meaningless. A marketability discount, however, was a way to adjust the price of the shares to reflect the difficulty of selling the shares of a closely held corporation in a public market. That difficulty, the court emphasized, existed whether the shares to be sold represented a majority or a minority of the total shares. A minority discount, on the other hand, would provide a windfall for the majority, subverting the statutory purpose of protecting the minority. 107 App Div at 146, 149; *see also Raskin v. Walter Karl, Inc.,* 129 App Div 2d 642, 644, 514 NYS2d 120 (1987).

We conclude that a minority discount is not appropriate in this case. The appraisers state that the enterprise value after a minority discount "represents the stock market value of the company." The purpose of the appraisal, however, is not to find the stock market value of the company or of Wyss' shares, but to find their fair value. The marketability discount, we conclude, sufficiently reflects the difference

between the shares' proportion of the enterprise value and their fair value. The dissenter's rights statute is not designed to produce the equivalent of a sale on the open market; rather, it is a legislative remedy for minority shareholders who find their interests threatened by significant corporate changes and who may have no other recourse. Columbia, which will purchase the shares, will not be in a minority position afterwards. Although this case is not a classic "squeeze out," and although we do not rely on any finding that Columbia acted improperly, it remains true that Wyss faced a potential dilution of his interest and had little choice but to exercise his statutory rights. To include a minority discount would simply penalize him while allowing the corporation to buy his shares cheaply. That is not the protection that the legislature had in mind or that other courts have provided.[9]

■ Columbia makes three assignments of error in its cross-appeal. The first relates to negotiations between the parties in fall 1984, before Columbia notified its shareholders of the proposed authorization of additional stock and, thus, before Wyss had any appraisal rights. In those negotiations, the parties sought, with the aid of a third party's mediation, to reach an agreement under which Wyss would sell his shares to Columbias. At one point Wyss told the third party the price that he would accept for his shares. During the course of this case, Columbia asked Wyss what that price was, and he refused to answer. The trial court refused to order him to divulge the amount on the ground that it was an offer to compromise a disputed claim. *See* OEC 408(1)(a). Columbia argues that there was no claim to compromise, because there was no legal dispute at the time.

Even if Columbia is correct, any error is not reversible. The appraisers' approach to determining fair value was to calculate Wyss' proportionate share of Columbia's enterprise value and to apply discounts to arrive at fair value. Although we have modified the appraisers' results, we accept that part of their approach. Wyss' willingness to accept a particular amount could not affect Columbia's enterprise value; it could be evidence only of the market value of his shares. We see no reason to believe that the appraisers would have modified the

---

[9] Wyss' remaining assignment of error relates to an evidentiary matter. Because we do not remand for the taking of further evidence, we do not need to consider it.

nature or amount of their suggested discounts if they had had this additional information. The trial court's ruling did not affect Columbia's substantial rights. OEC 103(1).

■■■ In its second assignment, Columbia asserts that the supposedly comparable sales that the appraisers used to determine enterprise value all involved companies that had agreements with their employes and clients that required them to remain with the acquiring companies. As a result, Columbia argues, those sales were not truly comparable to its situation. However, one of Columbia's experts also estimated Columbia's enterprise value, and that estimate was within the same range as those of Wyss' experts and of the appraisers. Columbia does not suggest an alternative to the method that the appraisers used. We find no error.

■■■ Columbia's final assignment is that the appraisers should have allowed it to explain the reasons behind its decision to issue the additional stock in order to rebut any suggestion that it was guilty of improper conduct. Nothing in either the appraisers' recommendations or in our decision is based on a conclusion that Columbia's action was improper. The appraisers specifically noted that fair market value might not be the appropriate measure of fair value in a squeeze out or other oppressive situation, but they found that no such circumstance existed in this case. Their recommendations were based on their view of the fair market value of Wyss' shares. Our decision not to apply a minority discount reflects our concern that dissenting shareholders not be penalized for exercising rights that they may have no choice but to exercise, but it also is not based on any determination that Columbia acted improperly. The excluded evidence could not have affected the result.

On appeal, judgment modified to provide that the fair value of Wyss' shares is $4,792,000 and to increase judgment in favor of Wyss to $3,712,000 and affirmed as modified; affirmed on cross-appeal.