Argued and submitted January 11, reversed and remanded on appeal; affirmed on
cross-appeal July 5, petition for review denied September 26, 1995
(322 Or 167)

Jackolyn L. DEWING,
Personal Representative of the
Estate of Verle H. Will, Deceased,
*Respondent - Cross-Appellant,*

*v.*

WESTERN SMELTING & METALS, INC.,
an Oregon corporation,
*Appellant - Cross-Respondent.*

(92P-1135; CA A81401)

898 P2d 224

Jeffrey P. Chicoine argued the cause for appellant - cross-respondent. With him on the briefs were Richard S. Pope and Newcomb, Sabin, Schwartz & Landsverk.

Joseph C. Guimond and Scott McArthur argued the cause for respondent - cross-appellant. With them on the brief was Enfield, Guimond & Brown.

Before Landau, Presiding Judge, and Leeson, Judge, and Buttler, Senior Judge.*

BUTTLER, S. J.

---

* Buttler, S. J., *vice* Riggs, P. J.

**BUTTLER, S. J.**

Plaintiff is the personal representative of the estate of her deceased father. Decedent and his two brothers were equal shareholders in defendant corporation, a family-owned scrap metal business in Dallas. The three shareholders had entered into a stock redemption agreement that required the corporation to purchase the shares of a deceased shareholder at their fair value, to be determined by agreement between the personal representative of the deceased shareholder and the corporation. Because plaintiff and defendant were unable to agree on the fair value of decedent's stock, plaintiff began this action for specific performance of that agreement, alleging that she had no adequate remedy at law. Her prayer asked the court to require defendant "to perform the stock redemption agreement in accordance with the terms thereof; and for such purpose asked the court to determine that the fair value of decedent's stock was the sum of $667,000 * * *."

Defendant appeals from the trial court's determination that the value of decedent's stock at the time of his death was $430,000, and its requiring defendant to make payment in accordance with the schedule set forth in the judgment. Plaintiff cross-appeals from the trial court's failure to award her interest on part of the judgment. At the outset, there is a dispute as to whether we review the record *de novo*, ORS 19.125(3),[1] or whether we review it under ORS 19.125(1),[2] in which case we would be bound by the trial court's findings of fact if there is evidence in the record to support them.

■ Plaintiff relies on *White v. Reger*, 49 Or App 43, 618 P2d 1304 (1980), for the proposition that a cause of action is not necessarily in equity simply because a party chooses to so label it; rather, the court must look at the true nature of the underlying claim. In that case, the plaintiff had characterized his action as a suit in equity, because he sought a temporary

---

[1] ORS 19.125(3) provides:

"Upon an appeal from a decree in a suit in equity, the Court of Appeals shall try the cause anew upon the record."

[2] ORS 19.125(1) provides:

"Upon an appeal from a judgment in an action at law, the scope of review shall be as provided in section 3, Article VII (Amended) of the Oregon Constitution."

restraining order in addition to a judgment for the reasonable value of his one-third interest in the partnership. The claim for injunctive relief was not raised at trial. The plaintiff appealed, contending that we should review *de novo*, because the complaint contained a prayer for injunctive relief. We held that the claim was an action at law, because no injunctive relief was involved below.

Here, although plaintiff's claims were premised on the contract between the stockholders and defendant, she did not file an action for breach of contract, alleging that a specified amount was owing and praying for judgment in that amount. Because the parties had not agreed on the value of their stock as the contract contemplated, she filed an action for specific performance of the stock redemption agreement and prayed for "judgment and decree" requiring defendant to perform the agreement according to its terms and, for that purpose, to determine that the fair value of the decedent's stock was $667,000. The "judgment and decree" entered by the trial court, the form of which was prepared by plaintiff's counsel, granted the relief for which plaintiff prayed, requiring defendant to perform in detail its obligations under the contract. Plaintiff sought the proper remedy; it is in equity and was properly tried to the court. Accordingly, we review *de novo*.

It is difficult to determine from the trial court's two letter rulings how it arrived at the sum of $430,000 as the value of decedent's shares as of the date of his death in June 1990. The parties and the trial court agreed that the value of decedent's shares is to be determined without regard to their marketability as a minority interest and are to be valued at one-third of the corporation's value, and that the value of the corporation is determined by the price a willing buyer would pay and a willing seller would accept at the time of the decedent's death. We also agree, and apply that standard. *Columbia Management Co. v. Wyss*, 94 Or App 195, 765 P2d 207 (1988).

Defendant commenced business in 1955 as an automobile wrecking yard. In 1967, it began processing nickel-based alloy scrap from Precision Castparts Corporation (PCC), an aerospace contractor in Portland. From 1970 to about 1976 it also operated an aluminum furnace. By 1974,

defendant discontinued dealing with automobile scrap and focused on processing PCC's scrap. By the 1980s, 80 to 90 percent of its business was built around purchasing, processing and selling PCC's nickel alloy scrap. Although defendant had no contract with PCC, their business relationship continued through mutual trust and good service.

Defendant's business from PCC had been declining because of the cyclical downturn in the aerospace industry and the decline in the defense industry. It has not succeeded in locating other major scrap suppliers, although it had derived some business from ORMET (Oregon Metallurgical Corp.) for recycling titanium after it acquired some new state-of-the-art equipment in 1988 and 1989.

In 1981, the three shareholders, including decedent, who were sons of defendant's founder, entered into the stock redemption agreement involved in this lawsuit. Its purpose was to impose restrictions on the sale, transfer or other disposition of defendant's stock by requiring their sale to and purchase by the corporation in order to limit ownership "to those who actively participate in the Corporation's business activities and directly contribute to its anticipated growth through their personal efforts * * *." The cost of defendant's purchase of the shares was funded, at least in part, by life insurance in the amount of $150,000, the amount that each of the parties agreed was the then value of their shares, which they held in equal amounts. Although the agreement required that the parties revalue their shares annually, the parties had not done that. Because plaintiff and defendant could not agree on the value as of the time of decedent's death, this lawsuit was filed.

■     Over the years, defendant accumulated a large stockpile of PCC nickel alloy scrap that it held for later processing and sale. When nickel prices rose from $2 to more than $8 a unit in 1988, defendant began to process and sell off the stockpile, and continued to do so through the height of that bull market in 1989. As the company sold from its stockpile, proceeds from the sale were used to purchase two sophisticated Spectro Test units for sorting and grading scrap. That equipment permitted defendant to increase substantially its efficiency in sorting and grading the stockpiled alloy. That added capacity permitted it to take maximum advantage of

the bull market in nickel by selling off the stockpile while prices were at or near their peak. As a result, its earnings were substantially greater in 1988 and 1989 than they had ever been, although they tapered off in 1990 as the price of nickel and its stockpile declined. Its earnings that year were, nevertheless, substantially higher than they were in the years before 1988.

Plaintiff's expert, in his first report evaluating defendant as of October 31, 1991, 14 months after decedent's death on June 23, 1990, expressed the opinion that the business had a value of $1,500,000. After this lawsuit was filed, he revised his opinion to value the business as of the date of decedent's death. That appraisal resulted in a value of $2,000,000. The reason for the dramatic difference, he explained, is that defendant's earnings in fiscal 1991 were substantially less than those in 1990, and he used only three years of the company's financial statements in arriving at the value. He conceded that normally one examines at least five years, but that he did not do so here because the corporate records for the years 1985, 1986 and 1987 were not reliable; there had been some irregularity in record keeping, perhaps as a result of embezzlement by the bookkeeper. However, he did consider 1987 in his first appraisal, but gave it very little weight. As a result, his second evaluation considered only the three years in which defendant's income was the highest in its history, because the price of nickel rose dramatically in 1988 and 1989 and, although it decreased in 1990, it was more than twice what it was in 1986 and 1987.

In making his appraisal, plaintiff's expert stated that the primary method of appraising an operating small business is to capitalize earnings. Using that method, he arrived at a value of $2,250,000. He also made an adjusted asset valuation that resulted in a value of $1,570,000. He then took the mean value of $2,000,000 as his appraised value of the corporation as of the close of the fiscal year 1990, using only the three-year period, even though he conceded that those years were aberrations.

Defendant's expert explained that the capitalization of earnings method was the generally accepted method for appraising the value of small businesses, and that it is an error to use the adjusted asset approach to determine the

value of a small business.[3] He also pointed out that, in applying that method using defendant's balance sheet as of June 1990, the date of decedent's death, plaintiff's expert included as an asset $155,230, which was the amount in a certificate of deposit representing life insurance proceeds, including interest, received by defendant, obviously, after that date and was dedicated to pay the price to purchase decedent's stock. By doing so, defendant's current assets were overvalued by 19.49 percent.

■     In applying the capitalization of earnings method, defendant's expert used three approaches. Under the first, he capitalized earnings, using an average of earnings for the years 1986 through 1990, because it is customary to look at five years if they are available,[4] particularly when the business is dependent on a commodity, such as nickel, where there are peaks and valleys. That approach yielded a value of $1,100,511 before deducting environmental cleanup costs.

The second approach capitalized earnings for the year of decedent's death, because 1990 was the median of earnings for the five-year period, resulting in a valuation of $960,831. Under the third approach, the expert used a capitalization of excess earnings method, resulting in a valuation of $1,057,021. Having gone through those computations, the expert calculated the value of the business as being within the range between the highest and lowest values, viewing those as the limits of what willing buyers and sellers would accept in negotiating a sale, and that the ultimate price would be approximately the midpoint of the extremes: $1,031,000.

That value was supported by the company's earnings in 1991, which were significantly lower than they were in

---

[3] He referred to *Value in Small Business and Professional Practices* by Shannon Pratt, one of the books used by the American Society of Appraisers in training appraisers for accreditation in business evaluation. The adjusted asset approach is discussed in the chapter entitled "Common Errors." Plaintiff's expert was accredited by that organization.

[4] In using the earnings for 1986 and 1987, he adjusted them by adding $41,000, as both appraisers had done for the year 1988, to account for conceded irregularities in the corporate books for those years. Those adjustments have some support in the record. Although defendant's expert recognized that earnings for those years, as adjusted, were not completely accurate, he considered that approach to be preferable to using only the three years in which it is conceded that defendant's earnings were at an all-time high.

1990. Although it is not acceptable to use that year in making the valuation, it is relevant to consider it as a check on the valuation methods used, *see Portgage Silica Co. v. Commissioner*, 49 F2d 985, 987 (6th Cir 1931), and here it confirms that 1988 and 1989 were not representative of defendant's earnings. Additionally, defendant's other expert witness, a broker engaged in the selling of small businesses, estimated the market value of defendant at $991,000, less than the cost of environmental cleanup. He emphasized defendant's heavy reliance on PCC for its business.

Considering the whole record and recognizing that appraisals of this type are not an exact science, we find that defendant's expert's approach is more credible. However, we average the values that he determined using the three approaches to capitalization of earnings and conclude that the fair value of defendant at the time of decedent's death was approximately $1,040,000.

That value does not take into account the estimated cost of environmental cleanup of the site. Shortly after decedent's death, in January or February 1991, the Oregon Department of Environmental Quality notified defendant that its site had been identified as one that had or may have had hazardous materials released to the environment and that a preliminary assessment was required. Defendant could either have DEQ perform one at defendant's expense, or it could retain an engineering firm to conduct it. Defendant retained Cascade Pacific Engineering, Inc., to perform the assessment, which was completed in September 1992. Its report distinguished between environmental liabilities that existed as of June 1990, when decedent died, and those that arose after that date. There were also some stormwater problems estimated to cost $10,350. The report treated the cleanup costs as expenses and the costs of curing the stormwater problems as capital improvements. That distinction is correct, *Bors and Bors*, 115 Or App 572, 839 P2d 272 (1992), and plaintiff's contention that the cleanup costs should be capitalized is wrong.

■ Plaintiff argues that the trial court properly excluded from its valuation of the corporation the potential cost of environmental cleanup, because there was no general concern about environmental problems until after decedent's

death. She is wrong. First, plaintiff's own expert deducted $29,000 for environmental cleanup, which was the amount that had been expended as of the date of his first appraisal report in October 1991. Second, *The Environmental Law Handbook — A Malpractice Avoidance Guide for Every Oregon Lawyer,* published by the Oregon State Bar Professional Liability Fund in 1990, warned lawyers of the danger in not considering environmental cleanup in connection with the purchase or sale of a business. Plaintiff's contention that, in any event, environmental cleanup costs must be borne by the shareholders who owned the land is wrong. Under federal hazardous waste laws, defendant is liable for the contamination, because it generated the contamination. 42 USC § 9607(a) (Supp 1994).[5]

---

[5] 42 USC § 9607(a) (Supp 1994) provides:

"Sec. 9607.   Liability

"(a)   Covered persons; scope; recoverable costs and damages; interest rate; 'comparable maturity' date

"Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section —

"(1)   the owner and operator of a vessel or a facility,

"(2)   any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

"(3)   any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

"(4)   any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for —

"(A)   all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

"(B)   any other necessary costs of response incurred by any other person consistent with the national contingency plan;

"(C)   damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

"(D)   the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

"The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such

■ Although plaintiff contends that the costs claimed for environmental cleanup ($127,000) are exaggerated, there is little evidence to support that contention, except, perhaps, that the labor costs claimed by defendant ($26,000) are excessive and that defendant still has some of the equipment that it purchased for that purpose and that equipment has value. We are inclined to agree that the evidence on labor costs is less than clear. Defendant claimed $22 an hour as the cost it incurred in paying its employees for cleanup. We find that the more reliable testimony is that wages averaged $15 an hour, including fringe benefits. Although there is testimony that $6 an hour was added for overhead, it is not explained. Using defendant's claim for $22 an hour, a total of 1,182 hours was expended in cleanup. Using $15 an hour as the reasonable labor expense, we arrive at $17,730, which we find to be the reasonable cost of defendant's labor, and, therefore, deduct $8,270 from the costs claimed by defendant.

With respect to the equipment, defendant claimed as expenses the total cost of a new electric motor, $858, and the total cost of switch gear, $1,373, although it still has them and they have value. Because the record does not disclose either their reasonable rental value or their present value, we deduct $2,231 from the claimed costs. Therefore, we find that the cleanup costs were $10,500 less than defendant claims.

To recapitulate, we find that the value of defendant's business as of June 16, 1990, was $1,040,000, less the environmental cleanup costs of $116,500, for a net value of the corporation of $923,500. Plaintiff's one-third interest is $307,833.

On cross-appeal, plaintiff assigns error to the trial court's failure to provide for interest on the life insurance proceeds from June 23, 1990, until January 9, 1991. Not only was that question not raised below, the form of judgment was submitted by plaintiff's counsel and was signed by the court

interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26. For purposes of applying such amendments to interest under this subsection, the term "comparable maturity" shall be determined with reference to the date on which interest accruing under this subsection commences."

without change. If there is a problem, it was waived, and we do not consider it.

On appeal, reversed and remanded for entry of judgment consistent with this opinion; affirmed on cross-appeal.