OPINION OF THE COURT
Edward T. O’Brien, J.
This proceeding is brought by the operating trustee in bankruptcy as successor in interest to a minority stockholder, Sidney Spielfogel (Spielfogel) for the judicial dissolution of the corporate entity known as Bambú Sales, Inc. (Bambú) pursuant to section 1104-a of the Business Corporation Law. The majority shareholders have elected to purchase the shares owned by petitioner and request the court to stay the dissolution and determine the fair value of the petitioner’s shares pursuant to section 1118 (b) of the Business Corporation Law.
The court is required to determine fair value of 21.6% interest of Spielfogel stock as of April 16, 1995, the day before the petition was filed as mandated by section 1104-a of the Business Corporation Law.
The proof presented by each side in connection with valuation consisted of the testimony of an expert and the written report prepared by each expert.
*461 Both experts testified there are three methods employed to determine a corporation’s value. These include the net asset value method, the market value approach, and the investment value method. These methods are well recognized in these proceedings. (See, Matter of Blake v Blake Agency, 107 AD2d 139, 146; Matter of Taines v Gene Barry One Hour Photo Process, 123 Misc 2d 529 [Sup Ct, NY County 1983].)
The net asset value method cannot be the basis for an evaluation of Spielfogel stock because the nature of the business of Bambú and the requirement that the value of the stock must be considered on the basis that Bambú is a going concern. (Matter of Marcus, 273 App Div 725, 728-729.)
Another method of valuation is the so-called market value method. Market value of stock has been defined as “the attraction a stock has in the market place and the extent to which the movement of this stock reflects the unfettered judgment of the buyers and sellers.” (Matter of Lipe-Rollway Corp. v Seligson, 59 Misc 2d 805, 806.) Measured by these criteria, Spielfogel’s stock has no value at all. It must be remembered that the corporation is a close corporation in which the petitioner has a 21.6% stock interest and the respondent the rest. That being so, the relationship between the stockholders vis-a-vis each other in practice closely approximates the relationship between partners. (Matter of Gordon & Weiss, 32 AD2d 279, 281.) In this close corporation, it was never intended that any of the stock be traded on the open market. More importantly, however, no one would buy the stock from Spielfogel at any price to find himself in the position" of Spielfogel — frozen out, without salary, without office,- without a say in the corporation’s affairs and completely dependent upon the remaining stockholders to declare dividends if, as and when they choose to do so. (Matter of Taines v Gene Barry One Hour Photo Process, supra.)
Furthermore, considering the nature of the business of Bambú in the court’s view no comparable company in the market place would be even remotely similar to the business of Bambú. Nevertheless, the respondent’s expert used a combination of market approach and the investment method of valuation and concluded a value by the average of the two. In so doing the expert utilized a service of the Institute of Business Appraisers and a firm known as Bizcomps which provides information on private sales and public sales of closely held businesses. These included wholesalers of tobacco and grocery related products. From a total of 10 transactions, he selected *462 nine based on the annual revenue of the companies and the age of the transaction. The range of annual revenue used to make the selection was up to $25 million or a factor of 10 times the recent revenue level of Bambú.
That assumption and use of a market value approach as a component in the determination of value in this case is invalid.
THE BUSINESS OF BAMBU
The evidence described Bambu’s only business as the wholesale distribution of cigarette paper which is manufactured in Spain and sold under the registered trademark Bambú. Although its products are protected through the use of the trademark, the company still faces the threat of contraband Bambú products being sold and incurs frequent legal expenses to defend its trademark. It would appear that the loss of the intellectual property rights for its products would have a material adverse effect on Bambu’s business. Bambú has a reputation for cigarette paper sold under the Bambú trademark that is recognized in the trade and by the purchasing public as being quality natural paper.
It is a business with a single product and a single supplier with a limited market. While the business of Bambú is the wholesale distribution of cigarette paper, it is not in the tobacco industry nor are any of the cigarette manufacturers among the customers of Bambú. While, in earlier times it was used to “roll your own” with tobacco, today, another substance controlled by most governments is now the choice of the buying public. Petitioner concedes" that Bambú products are used for illicit means and not tobacco products, and the evidence amply supports that fact. Furthermore, testimony illustrates that while there was a time that Bambú could advertise on buses locally, it can no longer do so because of the restraints imposed on the tobacco industry, and these restraints have become somewhat of an “antiproduct”.
Bambu’s sales are currently concentrated in two markets, the New York metropolitan area and the Caribbean (excluding Jamaica), and its products are generally distributed to its customers through other wholesale distributors or retailers. Some of its customers include locally: Bonanza, Hills Trading, Jetro Cash & Carry, United Wholesalers, T&R Tobacco; and for the Caribbean: Harcourt Bourne, Discolandia, N.C. Enterprises Ltd., Standard Shippers. Products are sold in four sizes and several package types which are dispensed from counter displays or gravity feed containers. Products are *463 shipped from leased warehouse space near the John F. Kennedy International Airport in New York City. Bambú is currently not marketing its products for distribution in any other markets and expenditures on advertising and promotion are immaterial in relation to sales and total expenses.
Bambu’s products are imported from Spain under an exclusive agreement with Miquel Y Costas & Miquel, S. A. Bambú currently has no alternate source of paper supply, but has been supplied by this company for over 10 years. Bambu’s current supplier is not its first supplier nor the original owner of the trademark. The previous supplier, which owned the trademark, had gone bankrupt in the 1980s and this led to the sale of the trademark as one of the debtor’s assets. Use of the trademark was later disputed by one of Bambu’s competitors, Republic Tobacco, Inc., and Bambú was forced to pay $945,000 to Republic in 1990 for continued use of the name.
In 1994, the United States Department of Labor initiated an action against Sidney and Michael Spielfogel to recover deficiencies in an employee’s pension fund. The Department of Labor has threatened to recover deficiencies from Bambú on the basis that Bambú was an affiliate of the family of companies for the employees of which the pension fund has been created. Under the terms of a consent judgment, to resolve that action, Bambú has had to pay the sum of $330,000 through installments beginning in early 1995.
Another litigation stems from a stock purchase agreement that occurred during the financial problems of the related companies in the 1980s. As a result of the closing of the other companies, Bambú remained as the only entity available in that agreement to cover a promissory note of over $7 million. Bambú was sued by the holders of the note, and it disputed its legitimacy. An agreement was reached in May 1995 and this issue was settled in July 1995, with the creditors accepting $900,000 from Bambú to be paid over time.
In addition to the cases cited above, which have been resolved, others are pending that primarily involve the family members of Sidney Spielfogel as plaintiffs which the court will not consider for the purpose of valuation of the total stock holdings of Bambú on the doctrine of merger.
Bambú maintains an office in Westbury, New York. It is taxed as a subchapter S corporation under the Internal Revenue Code.
Considering the whole picture of the business of Bambú, the only realistic approach by which to evaluate petitioner’s *464 shares is by the investment method. That is to find what a prudent informed investor would be willing to pay to buy the entire business as a going concern considering all the faptors indicated by the nature of the business, the risks involved, the expected projected return.
To arrive at the appropriate rate of return both experts started with the rate of return for risk-free treasury bonds. To this both experts added premiums based upon the type of investment relying upon a manual used for valuation purposes called Ibbotson 1995 Handbook, as follows:
Investment Rate of Return
A. Risk-free rate of return on treasury bonds 7.5%
B. Equity risk premium for large publicly traded companies 7.0%
C. Small stock premium (Ibbotson 1995 Handbook) 4.0%
18.5%
The difference between the experts is whether the amount of the Ibbotson small stock premium of 4% was enough for the risks inherent in Bambú. The operating trustee’s expert testified that the Ibbotson small stock premium accounted for all of the risks in Bambú. Respondent’s expert testified that the Ibbotson small stock premium was not sufficient for Bambú considering the inherent risks of the company.
The evidence indicated that the Ibbotson small stock premium was based on a “fund” of publicly traded companies in which each company in the fund had. a capitalization of between $10 million and $150 million. However, the “fund” is of publicly traded companies and are indexes of a portfolio of stock of large and small companies, not the individual stock of any one company. Furthermore, the small stock premium is based on publicly traded companies which periodically release detailed financially related information.
In the court’s view the small stock premium for consideration of investment in Bambú is not realistic and a much higher risk factor must be assigned. Respondent’s expert testified that it is generally accepted in the valuation field that privately held companies, such as Bambú, require a rate of return between 20% and 40%. Respondent’s expert determined *465 that 331/3% is the appropriate rate of return for Bambú based upon the following risk factors: Bambú is a single product company, namely, cigarette rolling paper; Bambú has a single foreign supplier; Bambú has a limited geographic sales market, namely, the New York metropolitan area and the Caribbean; the sale of Bambu’s sale product is subject to extensive government regulation; because of government regulation, Bambu’s ability to advertise is limited; during the years reviewed by the experts (1991-1994), Bambú incurred over $200,000 a year in legal and professional fees protecting its trademark and this is a continuing cost of doing business.
Both experts agree that the investment value method capitalizes the adjusted income stream of the business entity as well as an average assumed rate of return on the owner’s investment to establish the valuation. The income stream is determined by adjusting the historical earning of the company, certain nonrecurring or unusual expenses, interest expenses and the add-back of the owner’s compensation and benefits.
As part of the determination of the adjusted earnings of the company, a weighting factor is applied to the results of operations for the years under review. Heavier weighting is generally assigned to the later years as it is assumed that the most recent years are more indicative of future results.
However, in this analysis since the valuation date is April 16, 1995, the income for the first quarter of 1995 should be disregarded. An owner’s statement of $334.20 for the first quarter annualized at $2,086 in the court’s view would be disregarded by a potential lawyer for its lack of verification and be considered puffing.
Both experts testified that an integral part of the investment value or capitalized earning approach to valuation would be an appropriate discount for lack of marketability which the evidence indicates has a range of between 10% and 30% and are accepted as norms in both owners’ transactions and the Internal Revenue Service. However, a minority discount here should not be allowed for the valuation of Spielfogel’s minority interest. In this proceeding we must consider fair value as the value of all the stock of the company for sale.
THE court’s COMPUTATION OF VALUE
Based on the income tax returns of Bambú for the period 1991-1994 recast by petitioner’s expert, which were marked as exhibit 2 and accepted by the court, the pretax adjusted income is stated as follows:
*466 December 31, 1991
December 31, 1992
December 31, 1993
December 31, 1994
Pretax adjusted income Weighting factor Weighted pretax adjusted income
$ 1,241.80 1
1,241.80
$ 882.90 2
$1,765.80
$1,752.50 3
$5,257.50
$1,161.60 4
$4,646.40
Sum of Weighted $12,911.50
Pretax adjusted income _10
Sum of weighting factor
Weighted average pretax adjusted income value $12,910.50
In the court’s view the following factors should be used to reach a realistic capitalization rate which would be acceptable to a prudent investor:
Risk free rate
Equity risks premium
Small company premium
Expected rate of return
Capitalization rate
Weighted Average pretax adjusted income value
Capitalization rate
Capitalization average pretax adjusted income
Less long term liabilities: Pension and Promissory Note Case
Lack of marketability discount (25%).
Total discounted value of 100% of Bambú is
The Spielfogel interest is 21.6%
7.5% Long-Term Government Bonds
7.0% Ibbotson 1995 Handbook
20.0%
34.5% rounded to 33% 33.0%
3
$ 12,910.50 3
3.873.20
1,230.00
2.643.20
660.80
1,982.40
$428,198.00
*467 THE ERNST & YOUNG APPRAISAL
The Ernst & Young valuations of $477,028 made in 1994, the evidence demonstrated, was also based on historical financial statements of Bambú. However, the analysis was requested by the creditors’ committee in the Spielfogel bankruptcy proceedings to understand some loose guidelines for settlement purposes. Ernst & Young did not use a weighting factor, but took a straight average of pretax income, and did not consider a lack of marketability discount, and cannot be considered by the court as evidence of the value of Bambú stock.
THE CUTULI TRANSACTION
The Cutuli sale of .07924 shares of stock to the family of Sarah and Michael Spielfogel bought them 51% control of Bambú and effectively put Sidney Spielfogel out of the business. A buyer of the entire stock of the corporation may well consider that transaction as indicative of stock value and might well consider the transaction represented the sale and purchase of the controlling interest and, therefore, a premium factor was involved.
The evidence disclosed that Mr. Cutuli was a former long time and highly paid employee of Bambú. Though not formerly educated he had demonstrated good business sense and was himself an entrepreneur operating his own business in California. Some years ago his hard work and loyalty was rewarded by the gift of the stock he sold in 1994. However, that stock interest had caused him many tax problems over the years for he had to pay income taxes on dividends he never received (except for a payment for tax liability incurred during 1994). When the offer to buy was made, he responded eagerly and negotiated the shares sold at $150,000 or $166,000, if the tax payment also made in 1994 is considered part of the purchase moneys.
On the totality of the evidence the court is convinced that Mr. Cutuli’s sale was an arm’s length transaction but not indicative of the value of Bambu’s stock. The personal considerations of Mr. Cutuli dominated the event.
Accordingly, it is the court’s determination that the value of *468 the 21.6 shares of the stock of Bambú held by petitioner is $428,198. Interest should accrue from the valuation date of 5.75% per annum.