******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

R.D. CLARK & SONS, INC., ET AL. *v.*
JAMES CLARK ET AL.
(AC 40592)

DiPentima, C. J., and Devlin and Sullivan, Js.

*Syllabus*

The plaintiff R Co. sought to recover damages from the defendant J, a minority shareholder of R. Co., for alleged breach of fiduciary duty. Since 1984, R Co., which was founded by R, the late father of the individual parties, who are all siblings, has operated as a specialty freight trucking business. When R died, C assumed R's shares of R Co., and the siblings managed R Co.'s operations until they had a falling out in 2011, and J resigned from his positions as an officer and director of R Co. After the plaintiffs commenced the underlying action, J filed a counterclaim seeking dissolution of R Co. on the ground that the individual plaintiffs had engaged in illegal, oppressive and fraudulent conduct to J's detriment. In lieu of dissolution, R Co. elected to purchase J's shares in it at fair value, and the plaintiffs withdrew their complaint. J thereafter filed a second amended counterclaim alleging that R Co. had engaged in oppressive conduct because for many years it provided shareholders with funds to pay federal income tax liabilities incurred as a result of the pass-through of R Co.'s profits to them, but J had not received any such payments for the years of 2012, 2013, and 2014, even though he remained a shareholder. Because the parties could not agree as to the fair value of J's shares or to the terms of R Co.'s purchase of them, those issues were presented to the court, which, after a trial, determined the value of R Co. and the fair value of J's shares, and concluded that because R Co., through its majority shareholders, engaged in oppressive conduct toward J, J's interest in R Co. would not be subject to a minority discount. The court held further evidentiary hearings and determined that J's shares would not be reduced by a marketability discount and that J was entitled to attorney's fees and expert witness fees, and the court ordered R Co. to pay J certain sums. R Co. appealed to this court from the judgment of the trial court determining the fair value of J's shares, establishing the terms of payment for the purchase of those shares, and awarding attorney's fees and expert witness fees. J, on cross appeal, claimed that the trial court erred in not awarding attorney's fees in the amount of one third of the value of his interest in R Co. pursuant to a contingency fee agreement that he had signed with his counsel. *Held:*

1. R Co. could not prevail on its claim that the trial court erred by not tax affecting its earnings in analyzing its valuation; the court did not abuse its discretion in declining to tax affect R's future cash flow, as the court, in the absence of binding authority, carefully considered cases from other jurisdictions, which provided considerable support for its approach, the court was tasked with determining fair value, as opposed to fair market value, and the present case was ill-suited to tax affecting earnings in light of R Co.'s practice of extending loans to shareholders to cover their tax liabilities and then retiring those loans through the payment of bonuses, and it was entirely foreseeable that such a practice would continue after R Co. purchased J's shares.

2. The trial court did not err in declining to apply a minority discount to the value of J's shares, or in awarding attorney's fees and expert witness fees on the ground that J suffered oppression at the hands of R Co.'s majority shareholders: there was no basis in the record to support R Co.'s claim that J did not have a reasonable expectation of assistance from R Co. to cover his tax liabilities, and even though R Co. claimed that the decision of whether to assist J in covering his tax liabilities was made by its financial advisory board, not by the majority shareholders, that claim rested on the testimony of M, a financial advisor, who the court expressly found not credible; moreover, although R Co. claimed that J failed to establish his tax obligations for the years in question, the record supported the court's finding that R Co. provided tax adjustments to shareholders who had a potential tax liability, not only to those

who proved an actual tax liability, and the court properly rejected R Co.'s claim that any oppression occurred only after J petitioned for dissolution, as the court's finding of oppression was not limited to the 2014 tax year, but began in 2011, when J resigned as an officer and director, and, therefore, the court's finding of minority oppression was not clearly erroneous, it did not abuse its discretion by not applying a minority discount to the value of J's shares in R Co., and R Co.'s challenge to the court's award of attorney's fees and expert witness fees failed.

3. R. Co. could not prevail on its claim that the trial court erred in declining to apply a marketability discount to the value of J's shares, which was based on its claim that the court's failure to do so caused an undue financial burden: the court examined R Co.'s finances and the value of J's shares, and determined that there were no extraordinary circumstances that warranted a marketability discount, and even though J's one-third share of R Co. was substantial, that did not mean that R Co. should not be required to pay fair value for J's shares; moreover, the court focused on the financial burden of its judgment on R Co., as well as on R Co.'s financial viability, when it fashioned the ten year payment plan afforded to R Co. to satisfy the judgment, and, therefore, R Co. could not prevail on a claim of unfair financial burden simply because it might experience difficulty satisfying the court's judgment.

4. The trial court did not abuse its discretion in accounting for a certain loan due to R Co. from J and in ordering that certain sums be paid to J within thirty days of the date of judgment; given the irregular bookkeeping employed by R Co., the court's treatment of those sums was reasonable and equitable, as the court included J's loan balance as an asset of R Co., adding it, along with the loan balances of other shareholders, to the capitalized cash flow in arriving at R Co.'s total value, and it essentially credited J for the bonus provided to the two other shareholders in 2014 and reduced the value of J's share in R Co., and the court's decision to add the loan balance to the overall value of R Co. while reducing the value of J's shares by the credit was an imperfect, but justifiable treatment of those sums.

5. J could not prevail on his claim on cross appeal that the trial court abused its discretion by declining to award attorney's fees in the amount of one third of the value of J's shares in R Co. in accordance with a contingency fee agreement that he had signed with his counsel; although J claimed that the court did not first analyze the terms of the fee agreement before departing from its terms to prevent substantial unfairness to R Co., because the court reached the issue of substantial unfairness, the court necessarily first analyzed the terms of the contingency fee agreement and found that its terms were reasonable, and the court did not err in finding that adherence to the agreement would be substantially unfair to R Co., as the court did not hold that the agreement was unreasonable but, rather, found that the resulting award was unreasonable because it was over $100,000 more than an award based upon the actual services rendered by J's attorneys, and that finding was sufficient to sustain the court's determination that adhering to the agreement would be substantially unfair.

Argued September 9—officially released December 10, 2019

*Procedural History*

Action seeking damages for, inter alia, breach of fiduciary duty, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the named defendant filed a counterclaim seeking, inter alia, dissolution of the named plaintiff corporation; thereafter, the named plaintiff elected to purchase the named defendant's stock in the named plaintiff at fair value; subsequently, the plaintiffs withdrew their complaint; thereafter, the named defendant filed a second amended counterclaim; subsequently, the matter was tried to the court, *Hon. Joseph M. Shortall*, judge trial referee; judgment determining the fair value of the named defendant's shares in the named plaintiff and establishing terms of payment; thereafter, the court

awarded the named defendant attorney's fees and expenses, and the plaintiffs appealed to this court and the named defendant filed a cross appeal; subsequently, the defendant Carolyn Manchester et al. withdrew their claims on appeal. *Affirmed.*

*Richard P. Weinstein*, with whom, on the brief, was *Sarah Lingerheld*, for the appellant-cross appellee (named plaintiff).

*Jack G. Steigelfest*, with whom was *Christopher M. Harrington*, for the appellee-cross appellant (named defendant).

*Opinion*

DEVLIN, J. In this case involving the buyout of minority shares of a closely held corporation, the plaintiff, R.D. Clark & Sons, Inc. (corporation),[1] appeals, and the defendant James Clark[2] cross appeals, from the judgment of the trial court determining the fair value of those shares, establishing the terms of payment for the purchase of those shares, and awarding attorney's fees to the defendant. On appeal, the corporation asserts that the trial court erred in determining the value of the defendant's shares by (1) not tax affecting the corporation's earnings in analyzing its valuation, (2) not applying a minority discount to the value of the defendant's shares, and awarding the defendant attorney's and expert witness fees and costs, on the ground that the defendant suffered minority oppression at the hands of the plaintiffs, (3) not applying a marketability discount to the value of the defendant's shares, and (4) incorrectly accounting for a certain loan due to the corporation from the defendant and ordering that certain sums be paid to the defendant within thirty days of the date of judgment. On cross appeal, the defendant claims that the court erred by not awarding him attorney's fees in the amount of one third of the value of his shares in the corporation in accordance with the retainer agreement that he had signed with his counsel. We affirm the judgment of the trial court.

The following factual and procedural history is relevant to the issues on appeal. Since 1984, the corporation, which was founded by Robert D. Clark, the late father of the individual parties, who are all siblings, has operated as a specialty freight trucking business, transporting primarily gasoline, kerosene and water. Robert D. Clark owned one third of the shares of the corporation, and John Clark and the defendant also each owned one third. When Robert D. Clark died in May, 2011, Carolyn Manchester assumed his shares of the corporation. The three siblings served as officers and directors of the corporation, and managed the operations of the corporation until they had a falling out later in 2011, and the defendant was terminated from his position as a driver and occasional dispatcher. The defendant resigned from his positions as an officer and director of the corporation in February, 2012.

On April 2, 2014, the plaintiffs commenced the underlying action against the defendant and Smart Choice. In their five count complaint, the plaintiffs alleged, inter alia, that the defendant, after being terminated from his employment with the corporation in 2011, improperly utilized certain proprietary information to start a new business, Smart Choice, and undermined the corporation's business operations.

On September 19, 2014, the defendant and Smart Choice filed an answer and special defenses, and the

defendant, alone, filed a five count counterclaim seeking, inter alia, dissolution of the corporation pursuant to General Statutes § 33-896 (a),[3] on the ground that the individual plaintiffs had engaged in illegal, oppressive and/or fraudulent conduct to his detriment.

On November 21, 2014, the corporation elected, in lieu of dissolution, to purchase the defendant's shares in it at the fair value of those shares, pursuant to General Statutes § 33-900.[4]

On February 24, 2016, the plaintiffs withdrew their complaint against the defendant and Smart Choice. Also on that date, the defendant filed a second amended counterclaim alleging that the corporation had a practice for many years of providing shareholders with funds to pay the federal income tax liabilities incurred by them as a result of the pass-through of the corporation's profits to them, but that the defendant had not received any such payments from the corporation for the years 2012, 2013 and 2014, although he remained a shareholder of the corporation. The defendant claimed that said conduct by the plaintiffs was oppressive.

The parties were unable to reach an agreement as to the fair value of the defendant's shares in the corporation and the terms of the corporation's purchase of them, so those issues were presented to the court for determination. After a trial spanning several days in December, 2015, and February, 2016, the court issued a memorandum of decision on August 30, 2016, determining that (1) as of December 31, 2014,[5] the value of the corporation was $3,708,413, and the fair value of the defendant's shares of the corporation was $1,236,138, and (2) because the corporation, through the actions of its majority shareholders, engaged in oppressive conduct toward the defendant, the value of the defendant's interest in the corporation was not subject to a minority discount. The court further ordered that it would hold another hearing on the issues of whether there were extraordinary circumstances to justify the application of a marketability discount to the value of the defendant's shares, the terms according to which the corporation would purchase those shares, and whether the defendant was entitled to an award of reasonable attorney's and expert witness fees and expenses.

On September 8, 2016, the corporation filed a motion for reargument and reconsideration. On October 24, 2016, the court issued a memorandum of decision granting in part and denying in part that motion, determining that, upon reconsideration, the value of the corporation as of December 31, 2014, was $2,356,719, and the fair value of the defendant's shares in the corporation was $785,573.

On December 30, 2016, following another evidentiary hearing, the trial court issued a memorandum of deci-

sion determining, inter alia, that the value of the defendant's shares of the corporation should not be reduced by a marketability discount, the defendant was entitled to statutory attorney's and expert witness fees and expenses pursuant to § 33-900 (e),[6] and the defendant was not entitled to prejudgment interest, but was entitled to postjudgment interest.

On June 19, 2017, the trial court issued a memorandum of decision, following another hearing held on April 27, 2017, rendering judgment against the corporation and in favor of the defendant, holding that the defendant was entitled to a total sum of $983,028.09, including statutory attorney's fees and expert witness fees and expenses. The court also found that the defendant was entitled to postjudgment interest at the rate of 2.25 percent. The court ordered the corporation to pay $87,653 to the defendant within thirty days and, further, to pay $8339.29 per month to the defendant for a period of ten years, and to maintain a performance bond to secure payment of the judgment. The court also dismissed the defendant's counterclaim seeking a dissolution of the corporation.

On June 28, 2017, the corporation filed a motion for reconsideration limited to the portions of the trial court's June 19, 2017 decision requiring it to pay $87,653 to the defendant within thirty days and ordering it to obtain a performance bond. The court held an evidentiary hearing on these issues on August 24, 2017. On September 14, 2017, the court issued a memorandum of decision declining to modify its order that the corporation pay $87,653 to the defendant within thirty days. The court, however, vacated its order requiring the corporation to obtain a performance bond, but ordered that the corporation satisfy its monthly installments on the first of each month and that it be assessed a late charge if it did not timely satsisfy that obligation.

The corporation appeals from the judgment of the trial court determining the value of the defendant's shares and its award of attorney's and expert witness fees and expenses to the defendant. The defendant does not quarrel with the trial court's determination of the value of his interest in the corporation, but challenges, by way of cross appeal, the court's decision not to award attorney's fees in the amount of one third of the value of his interest in the corporation pursuant to the contingency fee agreement that he had signed with his counsel.

I

APPEAL

Because all of the claims raised by the corporation on appeal stem from the valuation of the defendant's shares in it, we begin by setting forth the following general applicable legal principles. As noted herein, the corporation elected to purchase the defendant's shares

at the fair value of those shares pursuant to § 33-900 (a). Section 33-900 (d) provides that, if the parties are unable to reach an agreement as to the fair value of the shares, the court shall determine the fair value of them as of the day before the date on which the petition was filed or as of such other date as the court deems appropriate under the circumstances.

"Fair value" is not defined in § 33-900. It is, however, defined in a separate provision of the Connecticut Business Corporation Act, which encompasses General Statutes §§ 33-600 to 33-998. General Statutes § 33-855 (3)[7] provides in relevant part: " 'Fair value' means the value of the corporation's shares determined . . . (B) using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal, and (C) without discounting for lack of marketability or minority status . . . ." This definition is identical to the definition of "fair value" contained in its counterpart under § 13.01 (4) of the American Bar Association's Model Business Corporation Act.[8] Given this definition, it seems evident that neither a minority discount nor a marketability discount would apply to the determination of the fair value of shares that are being purchased by a corporation, versus being sold on the market. This position is supported by the widely accepted principle that "fair value" is not synonymous with "fair market value." See, e.g., *Pueblo Bancorporation* v. *Lindoe, Inc.*, 63 P.3d 353, 363 (Colo. 2003); *Brynwood Co.* v. *Schweisberger*, 393 Ill. App. 3d 339, 353, 913 N.E.2d 150 (2009); *Franks* v. *Franks*, Court of Appeals of Michigan, Docket No. 343290,     N.W.2d    , 2019 WL 4648446, *15 (Mich. App. September 24, 2019); *Balsamides* v. *Protameen Chemicals, Inc.*, supra, 160 N.J. 374–77; *Columbia Management Co.* v. *Wyss*, 94 Or. App. 195, 202–206, 765 P.2d 207 (1988); *HMO-W, Inc.* v. *SSM Health Care System*, 234 Wis. 2d 707, 717–23, 611 N.W.2d 250 (2000). Accordingly, most courts disfavor the application of minority or marketability discounts in situations such as the one presented in this case. Connecticut has no appellate authority on this issue.

Here, the trial court did not make a pronouncement regarding the allowance or prohibition of minority or marketability discounts as a matter of law. Rather, the trial court presumed the propriety of their application, but declined to apply either given the facts presented in this case. We thus limit our analysis to the holdings of the trial court and the corporation's specific challenges to them.

There is no appellate authority mandating that a particular methodology be employed in determining fair value when a corporation elects to buy out a minority shareholder in lieu of dissolution. It is, however, well settled that "valuation is a factual determination. In assessing the value of . . . property . . . the trier

arrives at [its] own conclusions by weighing the opinions of the appraisers, the claims of the parties, and [its] own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. . . . The trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as [it] finds applicable; [its] determination is reviewable only if [it] misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard. . . . In determining whether the trial court reasonably could have concluded as it did on the basis of the evidence before it, we will give every reasonable presumption in favor of the correctness of [its] action." (Citation omitted; internal quotation marks omitted.) *Siracusa* v. *Siracusa*, 30 Conn. App. 560, 568–69, 621 A.2d 309 (1993). "The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Therefore, to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did." (Internal quotation marks omitted.) *Britto* v. *Britto*, 166 Conn. App. 240, 245–46, 141 A.3d 907 (2016).

The methodology used by the trial court in this case, as well as the parties' expert witnesses, to determine the value of the corporation as a going concern as of December 31, 2014, was (1) to make a projection of future cash flow, (2) to make adjustments to normalize this cash flow and (3) to apply a capitalization rate to arrive at a value for the business. Both parties presented expert testimony in support of their respective positions. The trial court expressly considered the various opinions of both expert witnesses, but, for the most part, agreed with the valuation methods and calculations utilized by the corporation's expert witness.

Despite the multitude of factors considered by the trial court in calculating the fair value of the defendant's shares in the corporation, and the complexity of those calculations, the corporation challenges the trial court's valuation on only three grounds. The corporation claims that the trial court erred by (1) not tax affecting the corporation's earnings in connection with its cash flow valuation analysis, (2) not making a downward adjustment in the value of the defendant's shares because the defendant was a minority shareholder, and (3) not making a downward adjustment in the value of the defendant's shares because of the limited marketability of shares in a closely held corporation. We address each of these claims, in addition to the plaintiff's challenge

to the trial court's award of attorney's and expert witness fees to the defendant, in turn.

A

The corporation first challenges the trial court's decision not to tax affect earnings in its analysis of the corporation's cash flow valuation. In performing their respective analyses of the value of the corporation, both of the parties' expert witnesses decreased the corporation's normalized earnings to reflect a pass-through tax rate; the corporation's expert applied a 25 percent tax rate and the defendant's expert applied a 12.6 percent tax rate. The trial court declined to apply any tax affecting adjustment. The corporation argues that "the [trial court's] failure to apply any tax adjustment results in an artificially inflated value of the corporation because it fails to take into account that shareholders will not receive the full benefit of the corporation's earnings because they must pay income tax on same."[9] (Emphasis omitted.) In other words, the corporation contends that the trial court should have reduced its projected future income by deducting hypothetical corporate income taxes even though, as an S corporation,[10] it does not pay taxes. We disagree.

"[V]aluation is a fact specific task exercise; tax affecting is but one tool in accomplishing that task." (Internal quotation marks omitted.) D. Tinkelman et al., "Sub S Valuation: To Tax Effect, or Not to Tax Effect, Is Not Really the Question," 65 Tax Law. 555, 587 (2012). Tax affecting "is the discounting of estimated future corporate earnings on the basis of an assumed future tax burden imposed on those earnings . . . ." *Dallas* v. *Commissioner of Internal Revenue*, T. C. Memo 2006-212, 92 T.C.M. (CHH) 313, 315 n.3 (T.C. 2006). The application of tax affecting to S corporations is complicated by the fact that S corporations do not pay taxes. See 26 U.S.C. § 1363 (a). Rather, the S corporation passes its income through to its shareholders who report their *pro rata* shares of that income on their individual tax returns. See 26 U.S.C. § 1366. Indeed, in the view of the United States Tax Court (tax court) and the Internal Revenue Service, the principal benefit enjoyed by S corporation shareholders is the reduction in the total tax burden imposed on the enterprise, a burden that should be considered when valuing an S corporation. *Gross* v. *Commissioner of Internal Revenue*, T. C. Memo. 1999-254, 78 T.C.M. (CCH) 201, 209 (T.C. 1999), aff'd, 272 F.3d 333 (6th Cir. 2001). Accordingly in *Gross*, the tax court approved, and the United States Court of Appeals for the Sixth Circuit affirmed, a valuation of stock in an S corporation that did not tax affect future earnings. Id., 335. Subsequent to *Gross*, the tax court has repeatedly refused to tax affect estimated earnings to determine the value of an S corporation. See, e.g., *Estate of Gallagher* v. *Commissioner of Internal Revenue*, T. C. Memo 2011-148, p. 12, 101 T.C.M. (CCH)

1702 (T.C. 2011) ("we will not impose an unjustified fictitious corporate tax rate burden on [the company's] future earnings")

The propriety of the application of tax adjustments has been, and remains, the subject of considerable debate, and there is no Connecticut law that mandates a specific approach to tax affecting. Like the tax court, some courts have chosen to reject an adjustment to S corporation cash flows based on taxes. See *In re Radiology Assocsiates, Inc. Litigation*, 611 A.2d 485, 495 (Del. Ch. 1991) (ignoring taxes altogether is only way discounted cash flow analysis can reflect accurately value of cash flow to investors); *In the Matter of the Dissolution of Bambu Sales, Inc.*, New York Supreme Court, 177 Misc. 2d 459, 464–66, 672 N.Y.S. 2d 613 (N.Y. Sup. December 17, 1997) (use of income method approach to value interest of minority shareholder without adjusting for taxes); *Vicario* v. *Vicario*, 901 A.2d 603, 609 (R.I. 2000) (trial court did not abuse discretion in not tax affecting earnings of S corporation).

Some courts, however, take a different view. The Delaware Court of Chancery approved the tax affecting of S corporation earnings in *Delaware Open MRI Radiology Associates, P.A.* v. *Kessler*, 898 A.2d 290 (Del. Ch. 2006). In *Kessler*, the court rejected both tax affecting at corporate rates and not tax affecting at all. Id. 326–30. Instead, comparing the income that could be received by shareholders in an S corporation and a C corporation after consideration of corporate taxes, dividend taxes and individual taxes, the court calculated a tax adjustment that would equalize the after-tax income each shareholder would receive. Id. The *Kessler* opinion cited to and acknowledged the earlier decision of the Delaware Chancery Court, *In re Radiology Associates, Inc. Litigation*, supra, 611 A.2d 485, and embraced its reasoning that the tax advantages of an S corporation should be given weight in the valuation analysis. *Delaware Open MRI Radiology Associates, P.A.* v. *Kessler*, supra, 327–28. *Kessler*, however, disagreed that the proper method to implement the S corporation tax benefits was to ignore taxes. Id.

The Supreme Judicial Court of Massachusetts approved of this approach in a case involving the valuation of an S corporation in a marital dissolution matter. *Bernier* v. *Bernier*, 449 Mass. 774, 782–83 n.15, 873 N.E. 2d 216 (2007). Some experts on corporate finance continue to advocate for tax affecting despite criticism by the tax court. *Wall* v. *Commissioner of Internal Revenue*, T. C. Memo 2001-75, 81 T.C.M. (CCH) 1425, 1439 n.25 (T.C. 2001).

Against this complicated legal backdrop, the trial court in the present case decided not to tax affect the future cash flow of the corporation. In this regard, the trial court did not abuse its discretion for several rea-

sons. First, such an approach finds considerable support in the previously cited tax cases as well as *Gross*, the only reported decision on tax affecting by a United States Court of Appeals. Second, the trial court in the present case was tasked with determining fair value, not fair market value. *Kessler*, in particular, was concerned with how willing buyers and sellers in a free market would value the stock in question. *Bernier* likewise involved a fair market valuation. Third, the issue of tax affecting continues to be an open debate among experts in the field. See D. Tinkelman, supra, 65 Tax Law. 557 (appraisal profession considers this controversial area, with some experts believing no S corporation premium is appropriate, and others endorsing use of one of number of different models to measure S corporation premium). Finally, the present case seems particularly ill-suited to tax affecting earnings in light of the corporation's practice of extending loans to shareholders to cover their tax liabilities and then retiring those loans through the payment of bonuses. It was entirely foreseeable that such a practice would continue after the defendant's shares were purchased by the corporation.

Our decision that the trial court did not abuse its discretion in not tax affecting projected future earnings is based on the facts of this case. We discern no bright line rule in this area. A trial court facing the issue of tax affecting in the future would certainly be able to consider cases such as *Gross*, *Kessler* and *Bernier* to decide whether tax affecting is appropriate under the circumstances. We conclude that, in the absence of binding authority, the trial court carefully considered the approaches employed by other jurisdictions and properly exercised its broad discretion by declining to tax affect the corporation's earnings.

B

The corporation next asserts that the trial court erred in not applying a discount to the value of the defendant's shares because of his status as a minority shareholder. The idea behind this so-called minority discount is that in an arms-length transaction, a willing buyer would pay less for a noncontrolling interest in a closely held corporation. *Pueblo Bancorporation* v. *Lindoe, Inc.*, supra, 63 P.3d 360. The trial court declined to reduce the value of the defendant's shares by a minority discount on the basis of its determination that the defendant had been subjected to oppressive conduct at the hands of the majority shareholders of the corporation. The corporation claims on appeal that the evidence presented at trial did not support the trial court's finding of minority oppression. The corporation also argues that the court improperly awarded attorney's fees and expert witness fees and expenses pursuant to § 33-900 (e) on the basis of that erroneous finding of oppression.

We first address the corporation's argument that the trial court erroneously determined that the majority shareholders engaged in oppressive conduct against the defendant. In addressing the defendant's claim of minority oppression, the trial court explained: "In his second amended counterclaim, seeking dissolution of the corporation pursuant to . . . § 33-896 (a) (1) [(B)], [the defendant] limits his claim of oppression to the allegation that, even though he remained a shareholder after his firing in September, 2011, John [Clark] and Carolyn [Manchester] excluded him from the corporation's long-standing policy of providing shareholders with funds to pay the federal tax liabilities they incurred as shareholders in an S corporation." Noting that the defendant's claim of oppression impacted both the corporation's claim for a minority discount and the defendant's claim for attorney's fees and expert witness fees and expenses, the court set forth the following definition of oppression, which is applied in numerous jurisdictions and has been accepted by the parties in this case: "Oppression in the context of a dissolution suit suggests a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members, or a visible departure from the standards of fair dealing and a violation of fair play as to which every shareholder who entrusts his money to a company is entitled. . . . [O]ppressive conduct in the corporate dissolution context . . . arise[s] when the controlling directors' conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the firm." (Citation omitted; internal quotation marks omitted.) See, e.g., *Rullan* v. *Goden*, 134 F. Supp. 3d 926, 949 (D. Md. 2015); *Natale* v. *Espy Corp.*, 2 F. Supp. 3d 93, 104 (D. Mass. 2014); *Bontempo* v. *Lare*, 444 Md. 344, 365–66, 119 A.3d 791 (2015); *Muellenberg* v. *Bikon Corp.*, 143 N.J. 168, 178–80, 669 A.2d 1382 (1996); *Matter of Kemp & Beatley, Inc.*, 64 N.Y.2d 63, 73, 473 N.E.2d 1173, 484 N.Y.S.2d 799 (1984); *Scott* v. *Trans-System, Inc.*, 148 Wash. 2d 701, 710–11, 64 P.3d 1 (2003).

With the foregoing definition in mind, the court set forth the following findings and reasoning: "The facts underlying [the defendant's] claim are not in dispute. [The defendant] testified that his father had begun the practice of making funds available to the shareholders to cover their income tax liabilities on their share of the corporation's profits right from the establishment of the corporation. Brian McAnneny, a financial consultant who has served as the corporation's chief financial officer for many years, affirmed that in 2009, John [Clark] and [the defendant] received approximately $60,000–$70,000 each from the corporation to pay federal income taxes on their share of the corporation's profits. No such payments were made to them in 2010 because the corporation lost money that year. That loss provided both John [Clark] and [the defendant] with a loss car-

ryforward for succeeding years' taxes. . . . McAnneny estimated the amount of the carryforward for each at $200,000, but he provided no documentation of those amounts. Moreover, though he assumed that both John [Clark] and [the defendant] enjoyed the tax benefits of those carryforwards in 2013 and 2014, he had no first-hand knowledge. And, other evidence revealed that John [Clark] received funds from the corporation in 2013 and 2014 to defray his federal income tax liabilities.

"Carolyn [Manchester] received no funds from the corporation prior to 2011 because she did not become a shareholder until after her father's death that year. Thereafter, she received substantial payments from the corporation for her use in paying her federal tax liability on the corporation's profits.

"For example, in 2014, the corporation's most successful year ever, the pass-through of corporate taxes to each of John [Clark], Carolyn [Manchester] and [the defendant] was $233,786. While John [Clark] and Carolyn [Manchester] received $180,000 each to defray the taxes they were required to pay, [the defendant] received nothing even though, by virtue of his continuing status as a shareholder, he was liable for taxes due on corporate profits. . . .

"John [Clark] and Carolyn [Manchester] seek to justify this disparity in treatment by characterizing the payments to them as 'loans' from the corporation even though no notes were ever signed, no interest was ever charged, no due dates for repayment were ever specified, and the 'loans' were repaid via 'bonuses' they received for that purpose from the corporation. As explained by . . . McAnneny, 'bonuses' were voted by an 'advisory board,' composed of . . . McAnneny and Attorneys Michael McDonald, corporate counsel, and Thomas Generis, counsel for selected corporate matters, specifically for the purpose of allowing John [Clark] and Carolyn [Manchester] to pay down 'loans' they had previously received. Funds sufficient to pay their income taxes on the 'bonuses' were deducted and paid to the government by the corporation. The balance of the 'bonuses' was credited to the loan account for each shareholder carried on the corporation's books. John [Clark] and Carolyn [Manchester] received no cash from these transactions.

"These 'loans' were carried as receivables on the corporation's books, including those made to [the defendant] prior to 2012. . . . At the end of 2014, John [Clark's] 'loan' balance was $234,333; Carolyn [Manchester's], $203,594. Unless and until the advisory board votes additional 'bonuses' to John [Clark] and Carolyn [Manchester], these 'loans' will remain unpaid.

"According to . . . McAnneny, these 'loans' were made to John [Clark] and Carolyn [Manchester] in their capacity as officers of the corporation, not as sharehold-

ers. Further, he testified, were the corporation to make such a 'loan' to [the defendant], who resigned as an officer early in 2012, the [Internal Revenue Service (IRS)] would have forced the corporation to treat it as a dividend, which would have triggered covenants in its outstanding loans, 'probably' resulting in the loans being called. This would have been a 'disaster' for the corporation, he testified.

"The court places little weight on this testimony. . . . McAnneny more than once in his testimony disavowed familiarity with IRS regulations, but he now relied on some unspecified IRS demand to explain why [the defendant] could not be treated the same as his fellow shareholders. He provided no documentation to support his vague testimony that a loan to [the defendant] would have triggered some unspecified covenants in the corporation's outstanding loans and what would be the effect for the corporation. . . .

"McAnneny never explained to the court's satisfaction why the corporation could not make a genuine loan to [the defendant] for the purpose of defraying the potential tax liability on his share of the corporate profits in 2012, 2013 and 2014, memorialized in a promissory note, with a market interest rate and a specified payoff date. The court concludes that the corporation never seriously considered such a mechanism as a vehicle to treat [the defendant] the same as John [Clark] and Carolyn [Manchester].

"John [Clark] and Carolyn [Manchester] also contend that they did not make the decision whether to provide funds to pay [the defendant's] taxes; rather, the advisory board made that decision, just as the same board decided what salaries to pay John [Clark] and Carolyn [Manchester] and whether to award them 'bonuses' for the purpose of paying down their loan accounts. The court considers this argument disingenuous. Suffice it to say that, should John [Clark] and Carolyn [Manchester], as majority shareholders, be dissatisfied with any of the advisory board's decisions, such as a refusal by the board to 'loan' them more money to pay their taxes, it is entirely within their authority to replace the members of the board with others who would bend to their will.

"They also point to a lack of proof that [the defendant] had any actual tax liability in 2012, 2013 or 2014. . . . But, the advisory board did not 'loan' John [Clark] and Carolyn [Manchester] money only when it was satisfied that they had an actual tax liability. The board made these 'loans' because John [Clark] and Carolyn [Manchester] were shareholders who had a *potential* tax liability by virtue of the corporation's status as an S [corporation]. [The defendant] occupied the same status, yet he was treated differently.

"The court finds that [the defendant] has proven by

a preponderance of the evidence that the corporation, through the actions of its majority shareholders, John [Clark] and Carolyn [Manchester], acted in an oppressive manner toward [the defendant], within the meaning of § 33-896 (a) (1). The disparate treatment of [the defendant] deviated from the standard of 'fair dealing' to which he was entitled and 'substantially defeat[ed] [his] expectation,' based on the corporation's established practice, that funds would be made available to him to defray any tax obligation he had as a shareholder in an 'S [corporation].' " (Footnotes omitted.) On the basis of the foregoing, the court declined to apply a minority discount to the value of the defendant's shares in the corporation.

The corporation now challenges the trial court's finding of oppressive conduct. In support of its claim that the court's finding of oppression was erroneous, the corporation asserts four arguments, all of which were considered and rejected by the trial court, and require little additional discussion. First, the corporation argues that the evidence presented at trial demonstrated that it was the customary practice of the corporation to provide loans only to officers and directors, not to shareholders, to help cover their pass-through tax liabilities. The corporation contends that there was "no basis to conclude that [the defendant] had any reasonable expectation that as merely a shareholder, he would receive loan payment[s] to defray taxes." The corporation asserted this same argument at trial, relying only upon McAnneny's testimony that its practice was to afford the tax benefit only to officers and directors, not shareholders. The court found McAnneny not credible, and rejected the corporation's argument. The corporation failed to establish that it was the custom and practice of the corporation to afford tax assistance only to officers and directors, and not to shareholders. We therefore agree that there is no basis in the record to support the corporation's argument that the defendant did not have a reasonable expectation of assistance from the corporation to cover his pass-through tax liabilities.

Second, the corporation argues that the decision of whether to afford the defendant assistance to cover his pass-through tax liabilities was not made by the majority shareholders but, rather, was made by the corporation's financial advisory board, and that that decision was founded on the belief that "any such loans to shareholders would be a red flag to the IRS and the loans would be construed as dividends." These arguments also rested on the testimony of McAnneny, who the trial court expressly found not credible. Because it is not the role of this court to second-guess the trial court's credibility determinations, we cannot conclude that the trial court erred in finding the corporation's argument in this regard disingenuous.

Third, the corporation argues that the trial court erred in finding oppressive conduct by the majority shareholders because the defendant failed to establish his tax obligations for the years in question. As the trial court aptly found, it had not been the practice of the corporation to provide loans to officers only after individual tax liabilities were determined. The record supports the trial court's finding that the corporation provided tax adjustments to shareholders who had a potential tax liability, not only to those who proved that they had an actual tax liability.

Finally, the corporation contends that any alleged oppression occurred only after the defendant petitioned for its dissolution because any tax assistance that the defendant may have received for his 2014 tax obligations would not have been awarded until after the valuation date of December 31, 2014. Because the trial court's finding of oppression was not limited to the 2014 tax year, but began in 2011, when the defendant resigned from his position as an officer and director of the corporation, the corporation's argument is unavailing.

On the basis of the foregoing, we conclude that the trial court's finding of minority oppression was not clearly erroneous and, thus, that it did not abuse its discretion by not applying a minority discount to the value of the defendant's shares in the corporation.

2

The corporation also claims that the court erred in awarding attorney's fees and expert witness fees and expenses to the defendant. On the basis of the trial court's finding that the defendant suffered from minority oppression at the hands of the plaintiffs, the court held that he had "probable grounds for relief" and was therefore entitled to attorney's fees and expert witness fees and expenses under § 33-900 (e). The corporation claims that the court erred in awarding those fees and expenses to the defendant on the ground that its determination of minority oppression was erroneous. Because we have concluded, as discussed previously, that the trial court's finding of oppression was supported by the record and, therefore, was not clearly erroneous, the corporation's challenge to the award of attorney's fees and expert witness fees and expenses must fail.

C

The corporation next claims that the trial court erred in not applying a marketability discount to the value of the defendant's shares. The corporation claims that the trial court erred in failing to apply a marketability discount to the value of the defendant's shares because such failure resulted in an "undue financial burden" on the corporation.[11] We are not persuaded.

As noted herein, the application of a marketability

discount is generally disfavored when determining the fair value, versus the fair market value, of the shares of a closely held corporation when the shares at issue are to be purchased in lieu of dissolution and where there is to be no actual sale of the shares on the open market. This position is supported by the language of § 33-855. Here, in addressing the corporation's claim that the value of the defendant's shares should be discounted for lack of marketability, the court explained that such a discount contemplates "the lack of liquidity on the open market of an ownership interest in a closely held corporation . . . ." The court noted that Connecticut law is "silent on whether and under what circumstances a marketability discount should be applied in valuing a dissenting shareholder's interest in a corporation," but observed that some courts have applied such a discount in the presence of extraordinary circumstances in order to "promote fairness and equity to all parties . . . ." The court then contrasted the facts presented in this case to other cases in which a marketability discount was applied on the basis of extraordinary circumstances where "the full value of a buyout greatly exceeded certain measures of the corporation's financial condition . . . ." That was not the case here.

The court further reasoned: "[T]here is no basis in the evidence or in reason for this court to adopt a certain percentage reduction for a marketability discount in this case. . . . There is no question from the evidence that 2015 was a bad year for the corporation financially, and 2016 appears to have been just as difficult. The court recognizes that requiring a buyout at full value for [the defendant's] share could place unrealistic financial demands on the corporation and reduce the cash flow and earnings necessary for future growth or even survival, especially in view of the large debt load the corporation carries. The way to deal with this issue is in setting the terms and conditions of purchase not in applying an arbitrary percentage discount." (Citations omitted; footnote omitted.) The court thus declined to apply a marketability discount to the value of the defendant's shares of the corporation.

Here, it is clear that the trial court carefully examined the relative finances of the corporation and the value of the defendant's shares, and determined that there were no extraordinary circumstances that warranted the application of a marketability discount. To be sure, the value of the defendant's one-third share of the corporation is substantial. That is not to say, however, that the corporation should not be required to pay fair value for those shares simply because they are valuable. Of course, the payment for the purchase of the defendant's shares, a purchase voluntarily elected by the corporation, undoubtedly would have some negative impact on the corporation's operations going forward. With that in mind, the court carefully considered the financial burden of its judgment on the corporation, and focused

on that burden and the financial viability of the corporation when it fashioned the ten year payment plan afforded to the corporation to satisfy the judgment. The corporation cannot prevail on a claim of extraordinary circumstance and unfair financial burden simply because it might experience difficulty satisfying the court's judgment. We therefore cannot conclude that the court abused its discretion by declining to apply a marketability discount to reduce the value of the defendant's shares in the corporation.

### D

The corporation finally claims that the trial court incorrectly accounted for a $92,365 loan due to the corporation from the defendant and erred in ordering it to pay the defendant $87,635 within thirty days of the date of judgment. At trial, the defendant asserted that the $87,635 should be paid, but not deducted from the value of his one-third interest in the corporation. On appeal, the defendant conceded that the trial court's determination was justifiable. We agree with the defendant's position on appeal.

In 2014, the corporation made payments to John Clark and Carolyn Manchester in the amount of $180,000 each for their respective tax liabilities. The defendant received nothing, although his loan account supposedly received a $180,000 credit. The defendant's loan account at that time had carried a balance of $92,365. Theoretically, the $180,000 credit should have resulted in the payoff of the $92,365 loan, leaving a credit balance of $87,635. The corporation, however, did not account for it in that manner. Instead, it maintained on its books both a loan balance of $92,365, and a credit to the defendant of $87,635 that was held in a restricted account.

The trial court was dubious of the genuineness of the "loans" extended by the corporation, as well as the subsequent "bonuses" issued to repay them. In addressing the defendant's loan balance and credit balance reflected on the corporation's books, the trial court did three things. First, it included the $92,365 loan balance as an asset of the corporation and added it, along with the loan balances of other shareholders, to the capitalized cash flow in arriving at the corporation's total value. Second, it essentially gave the defendant credit for the $180,000 bonus provided to the other two shareholders in 2014 by (1) reducing to zero the $92,365 loan balance, and (2) ordering payment to the defendant of the credit balance of $87,635. Third, and importantly, the trial court reduced the value of the defendant's one-third share in the corporation by $87,635.

Given the irregular bookkeeping employed by the corporation, the trial court's treatment of these sums was reasonable and equitable. It neither reduced the value of the defendant's shares to reflect the value of

the repaid "loan" as requested by the corporation, nor treated the credit balance as an independent nonoperating asset to be paid in addition to the value of his one-third interest as requested by the defendant. The trial court's decision to add the loan balance to the overall value of the corporation while reducing the value of the defendant's shares by the credit was an imperfect, but justifiable treatment of these sums. In this regard, the trial court did not abuse its discretion.

## II

### CROSS APPEAL

On cross appeal, the defendant claims that the trial court erred in not awarding him legal fees in accordance with the contingency fee based retainer agreement that he had signed with his counsel. We disagree.

On April 14, 2014, the defendant signed a retainer agreement providing that his counsel would be paid fees in the amount of one third of the amount that he recovered from the plaintiffs. After the court found the value of the defendant's shares of the corporation to be $785,573, the defendant sought attorney's fees from the corporation of one third of that award pursuant to the contingency fee agreement.

In addressing the defendant's request for attorney's fees, the trial court held: "An award of $261,596 for counsel fees, i.e., one third of the value of [the defendant]'s share of the corporation as found by the court, is patently unreasonable when the time sheets kept by his counsel demonstrate that the services rendered costed out at a maximum of $158,620. For that reason and because adhering to the contingency fee agreement entered into by [the defendant] would be 'substantially unfair' to the corporation that will have to pay his 'reasonable' fees; *Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210, 270–71, [828 A.2d 64] (2003); the court will depart from the agreement in determining what are the fees to be awarded [the defendant]." The court proceeded to consider the time sheets and affidavits submitted by the defendant's counsel, and ruled that the defendant was entitled to attorney's fees for services rendered by his counsel for the time period of June 18, 2015, to October 31, 2016, to be calculated at an hourly rate of $350. The court ordered the defendant's attorney to file a statement of claimed attorney's fees consistent with its ruling.

The defendant thereafter moved for reargument or for reconsideration of the court's decision not to enforce the contingency fee agreement, and the court summarily denied that motion. The court subsequently ruled, by way of written memorandum of decision filed on June 19, 2017, that the defendant was entitled, inter alia, to attorney's fees in the amount of $150,045. The defendant now challenges the trial court's award of attorney's fees on the ground that it erred in departing

from the contingency fee agreement.

"In reviewing the defendant['s] claim, we are mindful of the delicate nature of the trial court's duty in calculating reasonable attorney's fees, and that [t]he amount of attorney's fees to be awarded rests in the sound discretion of the trial court and will not be disturbed on appeal unless the trial court has abused its discretion. . . . The trier is always in a more advantageous position to evaluate the services of counsel than are we. . . .

"Moreover, as discussed previously, Connecticut follows the American rule, a general principle under which, attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." (Citations omitted; internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 268–69.

In *Schoonmaker*, our Supreme Court held that "when a contingency fee agreement exists, a two step analysis is required to determine whether a trial court permissibly may depart from it in awarding a reasonable fee pursuant to statute or contract. The trial court first must analyze the terms of the agreement itself. . . . If the agreement is, by its terms, reasonable . . . the trial court may depart from its terms only when necessary to prevent substantial unfairness to the party, typically a defendant, who bears the ultimate responsibility for payment of the fee. . . . By contrast, if the trial court concludes that the agreement is, by its terms, unreasonable, it may exercise its discretion and award a reasonable fee in accordance with the factors enumerated in rule 1.5 (a) of the Rules of Professional Conduct." (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 270–72.

Here, the defendant claims that the trial court "omitted the first step [of the analysis required under *Schoonmaker*] and never undertook an analysis of the terms of the fee agreement itself. Instead, the sole basis for the trial court's determination that the fee awardable under the [retainer] agreement was unreasonable was [its] comparison to counsel's time sheets, a comparison that was irrelevant to the first step of the analysis." The defendant acknowledges that "the trial court recited compliance with this standard," but that "no analysis was provided" and that "the record does not support [the trial court's] conclusion [that an award of attorney's fees based upon the retainer agreement would be substantially unfair]." To the contrary, because the trial court reached the issue of substantial unfairness, the court necessarily first analyzed the terms of the contingency agreement itself, and found that those terms were reasonable. Inferring that the trial court considered the first step required in *Schoonmaker* before moving to the second step of substantial unfairness is consistent

with the well settled principle that "[i]n determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling." (Internal quotation marks omitted.) *Wethersfield* v. *PR Arrow, LLC*, 187 Conn. App. 604, 645, 203 A.3d 645, cert. denied, 331 Conn. 907, 202 A.3d 1022 (2019).[12]

The defendant also argues that the court erred in finding that adherence to the contingency fee agreement would be substantially unfair to the corporation. The defendant contends that "[i]t is not substantially unfair for the corporation to satisfy a reasonable contingency fee owed by [the defendant]" and that the court failed to set forth any factual findings in support of its determination that a fee awarded under the contingency fee agreement would be substantially unfair. In so arguing, the defendant overlooks the trial court's finding that "[a]n award of $261,596 for counsel fees, i.e., one-third of the value of [the defendant's] share of the corporation as found by the court, is patently unreasonable when the time sheets kept by his counsel demonstrate that the services rendered costed out at a maximum of $158,620." In so doing, the court was not holding that the contingency fee agreement itself was unreasonable, but, rather, that the award resulting from that agreement was unreasonable in light of the fact that it was over $100,000 more than an award based upon the amount of and cost of services actually rendered by the defendant's attorneys. That finding is sufficient to sustain the trial court's determination that adhering to the contingency fee agreement would be substantially unfair to the corporation. Moreover, it is clear from the several memoranda of decision issued by the trial court in this case that the court was guided in those decisions by an overarching goal of ensuring fairness to both parties, including ensuring the future financial viability of the corporation. We therefore conclude that the court did not abuse its discretion in declining to award attorney's fees pursuant to the contingency fee agreement between the defendant and his counsel.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Carolyn Manchester and John Clark also were plaintiffs in this action, and, initially, were parties to this appeal. They subsequently withdrew their claims on appeal, leaving the corporation as the sole appellant. Any reference herein to the plaintiffs includes the corporation, Carolyn Manchester and John Clark.

[2] Smart Choice Trucking, LLC (Smart Choice), also was a defendant in this action. Because the claims against Smart Choice were withdrawn, all references herein to the defendant refer only to James Clark.

[3] General Statutes § 33-896 (a) provides in relevant part: "The superior court for the judicial district where the corporation's principal office or, if none in this state, its registered office, is located may dissolve a corporation:

"(1) In a proceeding by a shareholder if it is established that: (A) (i) The directors are deadlocked in the management of the corporate affairs, (ii) the shareholders are unable to break the deadlock, and (iii) irreparable injury to the corporation is threatened or being suffered or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock; (B) the directors

or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent; (C) the shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired; or (D) the corporate assets are being misapplied or wasted . . . ."

[4] General Statutes § 33-900 (a) provides in relevant part: "In a proceeding under subdivision (1) of subsection (a) of section 33-896 to dissolve a corporation, the corporation may elect or, if it fails to elect, one or more shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares. . . ."

[5] This date was agreed upon by the parties.

[6] General Statutes § 33-900 (e) provides in relevant part: "In a proceeding under subdivision (1) of subsection (a) of section 33-896, if the court finds that the petitioning shareholder had probable grounds for relief under said subdivision, it may award to the petitioning shareholder reasonable fees and expenses of counsel and of any experts employed by him."

[7] Although § 33-855 applies in the context of a determination of the rights of a dissenting shareholder, it has been observed, and we agree, that "there is no reason to believe that 'fair value' means something different when addressed to dissenting shareholders . . . than it does in the context of oppressed shareholders . . . ." (Citations omitted.) *Balsamides* v. *Protameen Chemicals, Inc.*, 160 N.J. 352, 374, 734 A.2d 721 (1999); see also *Robblee* v. *Robblee*, 68 Wash. App. 69, 77–80, 841 P.2d 1289 (1992) (holding that "fair value" means same in oppressed shareholder action as in dissenting shareholder action [internal quotation marks omitted]).

[8] "Connecticut's corporate law is substantially similar to the provisions of the American Bar Association's Model Business Corporation Act; see, e.g., *Trevek Enterprises, Inc.* v. *Victory Contracting Corp.*, 107 Conn. App. 574, 583 n.4, 945 A.2d 1056 (2008) ([i]n 1994, the General Assembly enacted . . . a comprehensive revision . . . designed to bring our corporations statutes into conformity with the American Bar Association's revised Model Business Corporation Act) . . . ." (Internal quotation marks omitted.) *Financial Freedom Acquisition, LLC* v. *Griffin*, 176 Conn. App. 314, 329, 170 A.3d 41, cert. denied, 327 Conn. 931, 171 A.3d 454 (2017).

[9] The corporation also argues that "[b]ecause both experts applied a tax adjustment, it was error for the trial court to substitute its own judgment and fail to apply any tax adjustment." This argument is belied by the axiomatic principle that the court is not bound by the opinions of expert witnesses. See, e.g., *Johnson* v. *Healy*, 183 Conn. 514, 516–17, 440 A.2d 765 (1981).

[10] An S corporation is a corporation with no more than 100 shareholders that passes through net income or losses to those shareholders in accordance with Internal Revenue Code, Chapter 1, Subchapter S.

[11] We note that this argument has nothing to do with the actual marketability of the shares at issue.

[12] Indeed, the parties did not dispute the reasonableness of the terms of the contingency fee agreement itself.